IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT,<br><br>           Plaintiff,<br><br>      v.<br><br>KEN SALAZAR, Secretary,<br>DEPARTMENT OF THE INTERIOR, an<br>agency of the United States, and BUREAU<br>OF LAND MANAGEMENT,<br><br>           Defendants. | Case No.  4: 08-CV-435-BLW<br><br>**MEMORANDUM DECISION<br>AND ORDER** |

## INTRODUCTION

The Court has before it cross-motions for summary judgment.  The Court heard

oral argument on January 30, 2012, and took the motions under advisement.  For the

reasons expressed below, the Court will grant WWP's motion and deny the remaining

motions.

## SUMMARY

In this decision, the Court reviews the BLM's renewal of grazing permits on five

allotments in the BLM's Owyhee and Bruneau Field Offices.  The parties have selected

these five permit renewals as test cases to render more manageable WWP's challenge to

some 600 BLM decisions that allegedly failed to protect the sage grouse, a species that is

in such decline that the BLM designed it as a "sensitive" species, to be treated as if it was

a candidate species under the Endangered Species Act.[1]

The main threat to the sage grouse comes from the destruction of its sage brush habitat, and one contributing factor to that destruction is livestock grazing. The sage grouse habitat on all five allotments is degraded, and much of that degradation was caused by livestock grazing.

Nevertheless, when evaluating these grazing permit renewals, the BLM decided to essentially maintain the same levels of grazing, continue the same seasons-of-use, and loosen restrictions on the permit holders. These decisions are not consistent with the land use plans governing the BLM's Bruneau and Owyhee Field Offices and therefore violate the Federal Land Policy and Management Act (FLPMA). They also fail to make significant progress toward improving conditions for the sage grouse and thus violate the Fundamentals of Rangeland Health (FRH) regulations. Finally, the BLM's decisions violate the National Environmental Policy Act (NEPA) because the agency did not conduct an analysis of the cumulative impacts of grazing over a sufficiently wide area.

## STANDARD OF REVIEW

The Court's review of these five permit renewals by the BLM is governed by the Administrative Procedures Act (APA), 5 U.S.C. § 706(2)(A). Under the APA, the reviewing court must set aside the agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A

---

[1] The sage grouse has recently received a "warranted-but-precluded" designation under the Endangered Species Act (ESA). That designation occurred after the decisions challenged here, and so will not be considered by the Court in deciding these motions.

**Memorandum Decision & Order - 2**

decision is arbitrary and capricious if the agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm'n*, 92 F.3d 940, 942 (9th Cir.1996). An agency action is also arbitrary and capricious if the agency fails to articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. *Id.* Finally, an agency must set forth clearly the grounds on which it acted. *See Atchison T. & S.F. Ry. v. Wichita Bd. of Trade*, 412 U.S. 800, 807 (1973).

"Review under the arbitrary and capricious standard is narrow, and the reviewing court may not substitute its judgment for that of the agency." *O'Keeffe's*, 92 F.3d at 942 (citing *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 376 (1989)). Courts "must be at [their] most deferential when reviewing scientific judgments and technical analyses within the agency's expertise." *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010). Courts "are not to act as a panel of scientists, instructing the agency, choosing among scientific studies, and ordering the agency to explain every possible scientific uncertainty." *Id.* at 1074 (citation omitted). And, "'[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.'" *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en

**Memorandum Decision & Order - 3**

banc) (quoting *Marsh,* 490 U.S. at 378).  With this in mind, the reviewing court must still

undertake a "thorough, probing, in-depth review" of the agency's decision.  *Citizens to*

*Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971).

## LITIGATION BACKGROUND

In its original complaint, WWP challenged about 600 separate decisions of the

BLM concerning some 40 million acres spread out over two states – Idaho and Nevada.

WWP's basic claim is that each decision fails to protect the sage grouse, a

BLM-designated sensitive species.

The BLM filed a motion to dismiss that the Court granted in part, finding that the

challenges to the decisions of the BLM's Nevada District Offices should be severed and

transferred to the District of Nevada.  The Court denied the motion in all other respects.

Thereafter, the parties agreed, and the Court approved, to use a "staggered"

approach to summary judgment.  In the first round of summary judgments, WWP would

challenge the BLM's renewal of grazing permits on certain allotments in the Owyhee and

Bruneau Field Offices, and then, after receiving a decision on those, would start a second

round by challenging another set of decisions, not yet selected.

In this first round, WWP challenges BLM decisions to renew grazing permits on

five allotments: (1) Rockville; (2) Silver City, (3) Diamond Basin; (4) Battle Creek; and

(5) East Castle Creek.  The latter two allotments are in the Bruneau Field Office; the

former three are in the Owyhee Field Office.

WWP seeks a summary judgment that these five decisions (1) violate NEPA

because they failed to contain a sufficient cumulative impacts analysis; (2) violate

FLPMA because they are not consistent with the Range Management Plans governing the

relevant Field Office; and (3) violate the Fundamentals of Rangeland Health regulations

because the BLM moved certain grazing restrictions out of the mandatory Terms and

Conditions category.

Before resolving those legal claims, the Court will first examine basic facts about

the sage grouse and then turn to a review of the condition of each allotment and the

BLM's decision to renew grazing on each allotment.

## FACTUAL BACKGROUND

### Owyhee & Bruneau Field Offices

The Owyhee Field Office is located in the southwestern corner of Idaho, bounded

on the west by Oregon, on the south by Nevada, and on the north by the Snake River.  It

covers about 1.8 million acres of mostly BLM land.

Just to its east is the Bruneau Field Office, covering about 1.5 million acres of

BLM land.  Both Field Offices are home to the sage grouse, among other BLM-

designated sensitive species.  Both contain large tracts of sage grouse habitat that support

part of the Great Basin core population of sage grouse, one of the five largest remaining

core populations across the entire range of this species.

### Sage Grouse Characteristics

The sage grouse is a squat feathered bird, about half the size of a turkey, grayish in

color with a black belly and spiky tail feathers.  It gets around mostly by walking, but is a

strong flier over a short distance. It is not a fast runner, so to escape predators, it will usually either hide or fly.

The birds inhabit the sage steppe ecosystem found in ten western states, including Idaho.  They are sagebrush obligates, and rely on sagebrush all year to provide roosting, cover and food.

The sagebrush-steppe (or sage-steppe) ecosystem is found across the "Great Basin" region, defined by the BLM to include much of southern Idaho and northern Nevada, plus portions of Oregon, California and Utah.  *See WWP v. Dyer* 2009 WL 484438 (D.Id. 2009).  The sage-steppe ecosystem features sagebrush in the overstory; native grasses, forbs, and litter in the understory; and biological soil crusts filling interspaces between vegetation.

During the winter months, sage grouse depend almost exclusively on sagebrush for food. As winter turns to spring, in early March, sage grouse move to breeding areas known as leks.  In Idaho, the lek season runs from about March 15 to May 1.  *Id.*  In establishing leks, sage grouse prefer sites with extensive cover of low grasses, surrounded by taller sagebrush.

After mating, the female moves away from the lek to establish a nest.  The nesting season in Idaho lasts from about April 1 to June 15.  This nesting season is critical because the sage grouse has one of the lowest reproductive rates of any North American game bird, and its populations are not able to recover from low numbers as quickly as many other upland game bird species.

**Memorandum Decision & Order - 6**

The nest is a shallow depression on the ground, usually under sagebrush. The nests established under sagebrush are more successful than nests under other shrub species. The reason is that taller stands of sagebrush and grasses provide scent, visual and physical barriers to potential predators.  Without this cover, predators can more easily locate the hen and her chicks as they leave the nest to seek food.

The hen and chicks require high quality forbs, which are herbaceous flowering plants, other than grasses.   The forbs provide good nutrition for the hen, increasing her chances of successfully giving birth to, and raising, her chicks.  Both the hen and her chicks also feed on insects and beetles.  An herbaceous understory provides greater access to insects and forbs, both by the females before breeding and by chicks after hatching.

**Sage Grouse Migration**

Sage-grouse typically inhabit large, interconnected expanses of sagebrush habitat, and thus are characterized as a landscape-scale species.  *AR 9463.*  While some populations are resident, others have been recorded traveling distances up to 100 miles. *AR 9430.*  Sage grouse in Idaho moved as far as 50 miles from breeding and nesting sites to summer ranges, although migration may be much shorter depending on the distance between ranges.  *AR 9458.*  On an annual basis migratory sage-grouse populations may occupy an area that exceeds 1,042 square miles.  *AR 10957*

During summer months, the sage grouse move to wetter habitats like springs, wet meadows, and irrigated areas, as these areas will have good forb cover.  *AR 9457-58.* These moist areas are critical late brood-rearing habitat.  *Id.*  As fall comes, and turns to

**Memorandum Decision & Order - 7**

winter, sage grouse migrate to winter sites, gradually eating less forbs and more

sagebrush, until they are eating almost exclusively sagebrush by December.

**Sage Grouse Population Trends**

Greater sage grouse populations have been declining for at least 25 years. *AR 9533*. Eight of ten states showed population declines over the last 10 years. *Id*. Range-wide sage grouse populations declined at an overall rate of 2.0% per year from 1965 to 2003, with the rate of decline being much higher in the first two decades (1965 to 1986) compared to the last two decades (1986 to 2003). *Id*.

The Conservation Plan published in 2006 by the Idaho Sage Grouse Task Force, acting under the direction of the Idaho Fish and Game Commission, estimated that Idaho's sage-grouse population, during the years 1965-2003, declined at an average rate of 1.47% per year. *See Conservation Plan* at p. 3-1.[2]  The most dramatic decline occurred between 1965-1984, when the sage-grouse population declined by an average rate of 3.04% per year. *Id*.  Between 1985 and 2003, the average decline slowed, to 0.12% annually. *Id*.  In general, Idaho sage-grouse numbers reached a low in the mid 1990s but have increased since that time. *Id*.  Nevertheless, "[a]nnual rates of change suggest a long-term decline for sage grouse in Idaho." *AR 9563 (Conservation Assessment)*.

**Habitat Trends**

---

[2]  Due to a mistake, only a portion of the Conservation Plan was included in the Administrative Record before the Court.  Nevertheless, the entire document was before the BLM and will be considered.

**Memorandum Decision & Order - 8**

The declining populations are occurring as sage brush habitat disappears.  The leading experts concluded in the Conservation Plan that "[t]he loss and fragmentation of sage-grouse habitat in some parts of Idaho are of major concern." *Conservation Plan* at p. 3-3.  The top four causes of this habitat loss and fragmentation in Idaho are (1) wildfire, (2) infrastructure, (3) annual grasses, and (4) livestock impacts.  *Id.* at *p. 4-3*. These threats are not independent of one another but are in fact closely related.  Annual grasses like cheatgrass provide abundant fuel resulting in hotter and more frequent wildfires that destroy huge swaths of sage grouse habitat.  *See Conservation Plan* at pp. 4-5 to -6.  Cheatgrass is spread, in part, along infrastructure like fences used to control livestock grazing. The posts of these fences also provide perch sites for predators, and the barbed wires often injure or kill the low-flying sage grouse.  *Id*. at p. 4-58.  Livestock grazing reduces the forbs and perennial grasses so critical during the sage grouse nesting season in Idaho from April 1 to June 15.  *Id*. at p. 4-60.

## Sage Grouse Improvement Plans

To protect sage-grouse from further habitat and population losses, the BLM adopted in November of 2004, a National Sage-Grouse Habitat Conservation Strategy to give management direction and guidelines to BLM Field Office staff.  The BLM has also designated greater sage-grouse a "sensitive" species in the Bruneau and Owyhee Field Offices, and across its range, pursuant to BLM's 2001 Special Status Species Policy. That Policy requires that "sensitive" species be afforded, at a minimum, the same protections as candidate species for listing under the ESA, and makes BLM Field Office

managers responsible for implementing the Policy.

Also in 2004, leading experts on the sage grouse published the Conservation Assessment.  *AR 9335-9945.*  In 2006, the Idaho Sage Grouse Task Force published the Conservation Plan for the Greater Sage Grouse in Idaho (Idaho Conservation Plan).  *AR 10946-58.*

**Rockville Allotment**

The Rockville Allotment is located in the Owyhee Field Office, adjacent to the Oregon-Idaho border.  Its seven pastures (1, 2, 3, 4, 5S, 5N, and 6) contain 13,903 acres, making it the smallest of the allotments at issue in this decision.  Two permitees graze cattle and sheep on these pastures between April 1 and November 31 of each year.  The allotment is also home to the sage grouse, among other imperiled animal species.  *AR 23489.*

The allotment's permits were challenged by WWP in *Idaho Watersheds Project v. Hahn*, Case No. 97-0519-S-BLW.  *See Idaho Watersheds Project v. Hahn*, 307 F.3d 815 (9th Cir. 2002).  In that litigation, this Court, on remand, ordered the BLM to complete a NEPA review by 2006.  *AR23758-59.*  In accordance with the Court's order, the BLM took the first step in that analysis by issuing, on September 21, 2004, the Determination under the Fundamentals of Rangeland Health.  *AR 23531.*

In that Determination, the BLM found that (1) Standard 4 (native plant communities) was being met; (2) Standards 2 (riparian) and 3 (stream channels) were not being met but were making significant progress toward meeting the standards; and (3)

Standards 1 (watersheds), 5 (seedings), and 8 (endangered species) were not being met and "livestock grazing management practices are significant factors" in not meeting those standards. *Id.*

In explaining why grazing resulted in a failure of the allotment to meet Standard 1 (watersheds), the BLM found that pastures 1, 2, 3, and 4 "are grazed during the critical growth period and grazing practices have not been altered appropriately during drought conditions. Current livestock grazing practices appear to be keeping the unburned portions of these pastures from improving." *AR 23532.*

In explaining why grazing resulted in a failure of the allotment to meet Standard 8 (endangered species), the BLM found that (1) sagebrush did not provide adequate cover for sage grouse in pastures 1, 2, 3 and 4; (2) native bunchgrasses and seeded crested wheatgrass were reduced in pastures 1, 2, and 3, contributing to "unsatisfactory or marginal sage grouse breeding habitat ratings"; (3) limited forb diversity and abundance "is limiting habitat suitability for sage grouse"; and (4) sage grouse late brood-rearing habitat "was very limited within the allotment . . . ." *AR 23542.*

In June 2008, the BLM issued an Environmental Assessment (EA) evaluating the impacts of the renewal of grazing permits on the allotment. The EA addressed the Determination and stated that "[a]ction is needed to improve livestock grazing management practices on the Rockville allotment where we are not achieving nor making significant progress toward achieving the standards for rangeland health as a result of current livestock grazing management practices." *AR 23755.*

Memorandum Decision & Order - 11

In the EA, BLM looked at three alternatives, including (1) re-authorizing grazing without modification (Alternative A), (2) allowing grazing to continue under a modified approach proposed by the permitees (Alternative B), and (3) modifying existing grazing to transition from a four-year rest rotation scheme to a seven-year rest rotation scheme, divide Pasture 5 into two pastures (5S and 5N), and make minor adjustments in grazing numbers and seasons of use (Alternative C). *AR 23762* (outlining alternatives).

Alternative C was the BLM's proposed alternative. It proposed to use Annual Grazing Indicators that would set standards for such things as stubble height, streambank alterations, and forage utilization. *AR 23762.* The BLM explained that it would no longer make these standards mandatory (because they would be removed as Terms and Conditions on the grazing permits) but nevertheless stated that the standards were "required to be followed precisely." *AR 23763.* According to the BLM, a permit holder's failure to achieve the Indicators "may stimulate immediate action against the permit . . . holder . . . ." *Id.* 23770-74.

This created confusion among the permit holders because the BLM seemed to be taking back with one hand what it had just given with the other – that is, the BLM was saying that satisfying the Indicators was "required" but at the same time was removing them from the mandatory Terms and Conditions provisions. The BLM clarified this in its FONSI by explaining that the Indicators are not mandatory and that the BLM did not intend to authorize itself to "take immediate action against a permit" if an Indicator was violated. *AR 24996-7.* Instead, the BLM hopes that the Indicators, if adhered to, "will

**Memorandum Decision & Order - 12**

result in a reasonable expectation that long term desired conditions objectives will be achieved." *Id.* When BLM monitoring shows Indicators are not being met, modifications to grazing "would be practiced." *Id*

In its review of the direct and indirect impacts of Alternative C, the BLM concluded that "[t]he rest rotation, AUM reduction, and adherence to Annual Grazing Use Indicators, would promote perennial grass health and recruitment would be expected to improve." *AR 23776.* This improvement would, in turn, mean that "[p]astures 1, 2, 3, and 4 would be expected to make significant progress toward meeting Standard 1." *Id.* The BLM also concluded that "the rest rotation grazing schedule, AUM reductions, and Annual Grazing Use Indicators would result in making significant progress towards meeting Standards 4 and 5 throughout the allotment in the long term." *AR 23781.*

In finding that Alternative C would make "significant progress" the BLM relied on its conclusion that the Alternative proposed an "AUM reduction." *Id.* The EA – and eventually the Final Decision – settled on an AUM limit of 2,288. *AR 24983, 25009.* That is a reduction from the past AUM limit of 2,423. *AR 23761.* But the average actual use of the past 17 years – that is, the actual grazing levels that caused the degraded condition of the Rockville allotment – was 1,914 AUMs. *AR 23813.* Thus, Alternative C proposed a level of grazing *above* the past actual use levels that resulted in FRH violations. The reductions in AUMs cited by the BLM are largely illusory – they are simply reductions from past levels of permitted AUMs. When compared with past levels of actual use, Alternative C allowed *more* grazing. Thus, a key factor in the BLM's

**Memorandum Decision & Order - 13**

finding that Alternative C would make "significant progress" in curing FRH violations has no support in the record.

The BLM also relied on the "rest rotation" to find that Alternative C would result in "significant progress." This was an important finding because the BLM's FRH Determination, as discussed above, had found that grazing during "the critical growth period" was causing a violation of Standard 1 (watersheds) and also that grazing reduced certain grasses and forbs causing a violation of Standard 8 (endangered species). It is well-established in this record that to avoid conflicts with sage grouse nesting and late brood-rearing habitat grazing should be limited to mid-summer (June 20 to August 1), and to minimize impacts on herbaceous vegetation prior to the next nesting season it should be limited to late fall and winter months (November 15 to March 1). *AR 9540-63*.

Yet in this "rest rotation" cited by the BLM as a key to its "significant progress," grazing is permitted during the restricted time-frames in four of the seven years in pastures 1, 3 & 4. *AR 24985*. In pasture 2, grazing is permitted during these off-limit times in six of the seven years. *Id.* The BLM does not explain how it can make "significant progress" on its FRH violations when its grazing rotation repeats the same errors its Determination found were contributing to the FRH violations in the first place.

While the BLM concluded that Alternative C would be "an improvement over the current system," the agency never determined whether it would improve sage-grouse nesting, breeding, and late-rearing habitat across the Rockville allotment. *AR 23786*. Indeed, BLM provided no analysis or examination of whether Alternative C will make

**Memorandum Decision & Order - 14**

significant progress toward achieving Standard 8, or the Owyhee RMP requirements for managing sensitive species habitat.  AR 23786.

For its cumulative effects analysis, BLM chose an analysis area which includes the adjoining federal allotments and surrounding state and federal lands.  AR 23794.  In its three-sentence cumulative effects analysis for wildlife, BLM claims only that the effects of Alternative C and other actions would "eventually lead to improvements or maintaining habitat," and Alternative C "would allow for long term improvements in overall wildlife habitat for species such as sage grouse." AR 23797-98.

On July 2, 2008, BLM issued its Finding of No Significant Impact (FONSI) – determining that it was unnecessary to prepare an Environmental Impact Statement (EIS).  AR 23826-28.  In its FONSI, BLM never examines the impacts on sage-grouse of Alternative C – which allows livestock grazing within key sage-grouse habitat during the critical spring timeframe – together with other past, present and future grazing decisions occurring on federal lands within the Owyhee and Bruneau Field Offices.  *Id*.

On July 3, 2008, BLM issued its proposed grazing decisions on the Rockville allotment, which proposed to adopt the grazing scheme outlined as Alternative C in the EA.  *AR 23829-53.*  On July 13, 2008, WWP submitted its protest to BLM's proposed action, requesting that BLM undertaking a more thorough examination of the impacts of BLM's proposed grazing scheme on sage-grouse populations and habitat.  Among other issues, WWP protested the BLM's lack of enforceable terms and conditions, and BLM's reliance on so-called Annual Grazing Use Indicators.  *AR 23854.*

**Memorandum Decision & Order - 15**

On August 26, 2008, BLM responded to protests and issued its final grazing permit renewal decisions for the Rockville Allotment.  WWP filed an administrative appeal of the BLM's decisions to the IBLA on September 25, 2008.  Thereafter, on November 7, 2008, the IBLA denied WWP's petition for stay, and BLM's final decision became effective.  WWP voluntarily withdrew its appeal on November 18, 2008, and the IBLA dismissed the appeal.  The BLM issued grazing permits on February 19, 2009, and April 4, 2009, on the basis of the August 26, 2008, final decisions, and the permitees have been operating under those authorizations and the 2008 Final Decisions since that time.

**Silver City and Diamond Basin Allotments**

The Silver City and Diamond Basin allotments are located in the Owyhee Field Office.  The Silver City allotment contains 51,577 acres of federal public land; the Diamond Basin allotment contains about 11,416 acres of federal public lands.

These two allotments contain significant water features:  About 43 miles of stream channels cross through the allotments, and associated with those streams is about 140 acres of riparian areas.  *AR 26475*.  In additional, 41 springs occur in these allotments, mostly in Pastures 5A and 5B of the Silver City allotment.  *Id*.

The Silver City and Diamond Basin allotments are home to a number of sensitive wildlife species, including the sage-grouse.  *AR 26600-01*.  These allotments contain key sage-grouse habitat, including nesting, breeding and late-brood rearing habitat.  *AR 26534, 26477-78*.

Each allotment has 6 pastures.  On the Silver City allotment, one grazing permitee

is allowed 7,126 total permitted AUMs, 1,673 of which are in suspended use, giving him 5,453 in active use; the other permitee has 1,583 AUMs of permitted use, 450 of which are in suspended use, giving him 1,133 AUMs of active use. *AR 26464.* On the Diamond Basin allotment, the permitee has 2,239 AUMs of permitted use, although 776 of those AUMs are in suspended use, giving the permitee a total of 1,463 of active use AUMs. *AR 26464.*

On June 16, 2003, BLM issued its Determination under the Fundamentals of Rangeland Health on the Silver City and Diamond Basin allotments. On the Silver City allotment, BLM concluded that (1) portions of Standards 7 (water quality) & 8 (threatened species) were met; (2) portions of Standards 2 (riparian areas) & 3 (stream channels) were not met but livestock grazing was not a significant factors; and (3) Standards 1 (watersheds) & 4 (native plants), and portions of Standards 2, 3, 7 & 8, were not being met and livestock grazing was a significant factor. *AR 26458.*

Examining these findings in more depth reveals that although portions of the Silver City allotment met the Rangeland Standards, significant portions did not. For example, the water features of the allotment are critical to the sage grouse, and the health of these features is measured by Standards 2 (riparian areas) and 3 (stream channels). With regard to Standard 3, the BLM examined 37 stream segments within the Silver City allotment. Only 6 of those segments met the stream channel standards. *AR 26447-48.* Six other segments were not meeting the standard but were making significant progress. *Id.* For the remaining 25 segments – 67% of the total – the BLM found that they failed to meet

the stream channel standard, were not making significant progress toward doing so, and that livestock grazing was a significant factor in that failing.  The same figures apply to the BLM's analysis of Standard 2, the riparian area standard.  *AR 26445-46.*

With regard to Standard 8 (endangered species), the BLM found that the standard is not being met in pastures 1, 2, and 3 because they "lack tall perennial bunchgrasses for cover during the nesting season, cheatgrass is invading, and forbs for food are lacking." *AR 26456.*  On Pasture 4, BLM similarly concluded that the Standard was not being met because the "reduction in perennial bunchgrasses and forbs" made "cover and food for nesting grouse . . . marginal." *AR 26456.*  The BLM did conclude that pastures 5A and 5B were "both suitable for sage grouse and meeting the standard with adequate grasses and forbs for cover and food." *AR 26457.*

The BLM also issued a Determination on the Diamond Basin allotment. *AR 26426-39.* The BLM concluded that (1) Standards 2 (riparian) and 8 (threatened species) are not being met, but livestock are not significant factors, and (2) Standards 1, 4 & 5 are not being met and livestock are significant factors.  With regard to Standard 8 (endangered species), four of the five pastures lacked suitable habitat for the sage grouse:

> [B]reeding habitat is unsuitable in pastures 1, 2, and 3, but has little potential to become suitable with changes in grazing management because of a lack of forbs and grasses.  Pasture 4 has a mix of unsuitable to marginal areas, because of a reduction of forbs and tall grasses, and appears to be improving with the current rest-rotation system.  Pasture 5 is suitable where there is sage, however, it is undergoing invasion by juniper that is the major factor limiting suitability for sage grouse.

*AR 26437.*  While this analysis reveals that one pasture is improving, another is moving in

**Memorandum Decision & Order - 18**

the opposite direction.

In November 2003, BLM issued an Environmental Assessment for both the Silver City and the Diamond Basin allotments. The EA's stated purpose was to address the numerous failures of many pastures to meet the Rangeland Standards. *AR 26667.* The EA proposed the following alternatives to current grazing: (1) no changes; (2) existing management with livestock numbers at average actual use; (3) no grazing; (4) the proposed action, which called for increased grazing, additional fences, and some herding; and (5) an alternative that reduces grazing and shortens the season of use. *AR 26687-91.*

Under Alternative 4 (the preferred alternative), the BLM proposed to combine the Silver City and Diamond Basin allotments, rename the pastures, continue largely the same springs system with the same pastures (while removing Diamond Basin Pasture 4 from the west side spring system), and setting the future stocking rate at the current stock rate. *AR 26681, 26906-07 (maps of use areas in final grazing decision).* This alternative also included a host of range developments, including fence construction, cattleguards, and other structures. *AR 26684-86.*

Importantly, the preferred alternative also proposed moving the mandatory Terms and Conditions governing livestock grazing – such as mandatory stubble heights, stream bank trampling limits, riparian browse standards, and utilization limits – into the category of "Management Guidelines." *Compare AR 26671-72 (terms and conditions under existing management) with AR 26688-86 (terms and conditions under proposed alternative).* A "Management Guideline" is not a mandatory requirement with immediate

**Memorandum Decision & Order - 19**

consequences for non-compliance. *See WWP v U.S. Dept. of Interior*, 2009 WL 5218020 (D.Id. 2009) (holding that utilization limits were not mandatory requirements because BLM placed them in category of Management Guidelines instead of in separate category of Terms and Conditions).

Alternative 4 proposed a total of 4,932 AUMs for the combined Silver City/Diamond Basin allotment. *AR 26680.* This is a reduction from the 8,049 AUMs authorized previously. *AR 26464.* But the historic actual usage levels were far below the permitted limit of 8,049 AUMs – the average annual use since 1993 is about 4,134 AUMs a year.[3] Thus, Alternative 4 authorized grazing levels *above* the historical levels that had led to the allotment's degraded condition and FRH violations.

Alternative 4 also allows grazing during sensitive times – identified above in the discussion of the Rockville allotment – for the sage grouse. With regard to Silver City pastures 1, 2, 3 and 4, Alternative 4 allows grazing during the critical mating and nesting season every other year. *AR 26867 (Table 2).*[4] The same is true for Diamond Basin pastures 1, 2, 3, and 4. Alternative 4 authorizes this critical season grazing despite the fact that all eight of these pastures failed to meet Standard 8 (endangered species) due to degraded sage grouse habitat.

_____

[3] This was computed by using the actual use data contained in the BLM's FRH Assessment. *AR 26519, 26528 & 26562.*

[4] Silver City pastures 1, 2, 3, and 4 were renamed, respectively, Briar, Striker, Diamond, and Gerdie. Diamond Basin pastures 1, 2, 3, and 4 were renamed, respectively, Rabbit Cr., Moore, Diamond Well, and Point of Rocks.

**Memorandum Decision & Order - 20**

In November 2003, BLM issued its proposed grazing decision on these allotments, which proposed to adopt Alternative 4 from the EA. WWP protested these decisions on November 28, 2003. On January 12, 2004, BLM issued final grazing decisions to the permitees on the now-combined Silver City allotment. In these decisions, BLM formally adopted Alternative 4 as the final grazing scheme on the allotment. *Id.*

The final decisions also included a Finding of No Significant Impact (FONSI), in which the BLM decided to forego preparing an EIS examining in detail the ecological implications of the final decisions. *Id.* The FONSI did not include any further substantive analysis beyond the discussions in the earlier EA, and the FONSI did not examine the direct, indirect and cumulative impacts of increasing grazing during the spring on sage-grouse populations and habitat.

WWP appealed these decisions, and petitioned the Office of Case Hearings and Appeals (OHA) to stay these decisions, which OHA denied. Subsequently, WWP dismissed its appeal.

**Battle Creek**

The Battle Creek allotment is located in the Bruneau Field Office and contains about 145,085 acres of BLM lands extending nearly 35 miles into the Owyhee mountains. There are some 30 miles of streams, along with 18 upland seeps, springs and wet meadows, located on the allotment. *AR 5620.*

The allotment is home to the sage grouse, among other wild life. *AR 3683-85.* The higher elevation pastures within the Battle Creek allotment – i.e., all pastures except

pastures 8-21 – contain sage-grouse habitat, including nesting, summer brood-rearing, and winter habitats. *AR 3616.*  But the lower elevation pastures no longer provide suitable sage-grouse habitat because they lack adequate grasses and cover, are dominated by cheatgrass, or have burned.  *AR 4210, 4234, 4451-52.*  Across the entire allotment there is about 64,000 acres of sage-grouse habitat.  *AR 5664.*  BLM wildlife biologists have identified 7 historic leks within the Battle Creek allotment, with four of these leks being active in 1996 and 1997.  *AR 5664-5.*

On July 19, 1999, BLM issued the Battle Creek Allotment Analysis, Interpretation, and Evaluation (1999 Assessment).  *AR 5531-768.*  While most of the allotment contained sage grouse habitat in good condition, Standard 8 (endangered species) "was not met in brood rearing habitat which was generally in poor to fair condition because of concentrated livestock use on wet meadows and riparian areas."  *AR 5708.*  The BLM also found that "livestock grazing practices . . . do not conform with the Guidelines for Livestock Grazing Management."  *AR 5711.*

In September 1999, the BLM issued an EA examining various alternatives for grazing management.  *AR 5388-5530.*  BLM's proposed alternative including only minor changes in the grazing system.  In September 1999, BLM issued Final Decisions to implement the proposed action in the EA.  *AR 5291-387.*

Four permitees administratively appealed the 1999 decisions, and reached a settlement with the BLM in late 2003, under which the appeals were dismissed, the 1999 Final Decisions were set aside, and a new grazing regime was instituted as provided in the

settlement.  *AR 4446*.  Later, the BLM determined that additional analysis was needed

prior to implementing the settlement, and BLM reverted to pre-1999 livestock

management for the 2004–2007 grazing seasons, the same management that the BLM

found in the 1999 Assessment to be responsible for the FRH and Guidelines violations.

*AR 3526, 4446*.

On June 8, 2007, BLM issued a Battle Creek Allotment Evaluation and

Determination, evaluating the allotment under the FRH Standards.  *AR 4210-39*.  With

regard to Standard 1 (watersheds), the BLM found that 90% of the allotment was meeting

the standard.  However, Standards 2 (riparian), 3 (stream channels), 7 (water quality), and

8 (threatened species) were not met due to current grazing.  *AR 4210-39*.

With regard to Standards 2 (riparian) and 3 (stream channels), the Determination

found that "[o]n 7 miles of stream that are accessible to livestock, 5.6 miles of riparian

areas are functioning at risk with static or downward trends in condition."  *AR 4216;*

*4219*.  Of the 6 streams that are in part not meeting these two Standards, "5 were

identified in the [MFP] to be improved in condition for redband trout."  *Id*.

With regard to Standard 8 (threatened species), the Determination found that the

higher elevation pastures provided good habitat for sage grouse, but that pastures 8 and

21 have – due to historic grazing – lost native grasses and forbs to a degree that they are

unlikely to "respond to better management."  *AR 4236*.  Wet areas in Pasture 20 receive

livestock use in the hot season destroying key habitat for sage grouse.  *Id*.  Fences built to

limit use of wet meadows on upper Little Jack's Creek have not been effective in keeping

**Memorandum Decision & Order - 23**

cattle from using the creek.  *Id*.  There are some "relatively small but important habitats that are heavily impacted by livestock."  *Id*.  These areas "are wet meadows used as brood-rearing habitat by sage grouse in the Summer Pasture (Hutch Springs and upper Little Jacks) and the riparian habitat in Lower Shoofly Cr., which is important to mountain quail."  *Id*.  The Determination also noted that "Lower Shoofly Cr. is on a downward trend now . . . due to heavy to severe livestock use."  *Id.*

On January 9, 2008, the BLM issued an EA evaluating the environmental impacts of four proposed alternatives for reissuing grazing permits and constructing range projects on the Battle Creek allotment.  *AR 3516-732*.  In the EA, the BLM interpreted the FRH Determination to find that "the allotment meets the Standards for Rangeland Health, and that the areas where Standards were not being met were limited in size (several riparian areas) or were due to historic grazing (pastures 8 and 21)."  *AR 3531*.  While the EA noted the Standards violations on 5.7 miles of streams, discussed above, it found that 17 miles of streams were in proper functioning condition, and another 7.8 miles were functioning at risk but with an upward trend.  *AR 3586*.  The problem areas, the EA concluded, could be addressed with range projects like fencing and troughs, "and do not require overall adjustments to stocking levels, or large changes in grazing rotations."  *Id*.

Consequently, the BLM's preferred alternative – Alternative D – did not change the AUMs or seasons-of-use that governed grazing in past years on the allotment.  Alternative D proposed an AUM limit of 12,731, *AR 3534,* the same AUM limit that had governed grazing in the past years.  *AR 3526*.  In those past years, the average actual use

was about 8,507 AUMs[5], so Alternative D authorized the same level of grazing that had

actually been occurring in past years.  Alternative D similarly carried forward the past

seasons-of-use, with a few minor changes.  *AR 3534 (Table 4)*

The EA depended on range improvement projects rather than reduced AUMs or

changes to seasons-of-use to make significant progress in improving the FRH violations.

For example, with regard to Hutch Springs that was identified above as damaged sage

grouse habitat that led to a violation of Standard 8 (endangered species), Alternative D

proposed to fence the springs to keep cattle out, and provide a water trough below the

springs to lead cattle away from the area.  *SAR 32042, 32051.*  All told, the BLM

proposed to install 11 new troughs, 11 new miles of pipeline, 3.5 miles of new fences, and

3 miles of relocated fences across this high desert landscape—in addition to the 41

troughs, 60 miles of pipeline, and 51 miles of fence already present on the allotment.  *AR*

*3532*.

On the basis of this EA, the BLM issued a FONSI, finding that allowing grazing

under the proposed action would have no significant impact on the environment.  *AR*

*3513-15.*  On March 20, 2008, Western Watersheds timely filed an administrative appeal

and petition for stay of the EA, FONSI, Assessment, and the six Final Decisions, which

---

[5] This was computed using actual use data in the EA on the two areas of the Battle Creek allotment: (1) Little Jack's Creek Use Area and (2) Battle Creek Use Area.  The Battle Creek Use Area average (7360 AUMs) was computed by taking the actual use figures contained in Table 6 of the EA and dividing by the number of years.  *AR 3537.*  The Little Jack's Creek Use Area average (1201 AUMs) was computed by taking the actual use figures contained in Table 8 of the EA and dividing by the number of years.  *AR 3540.*

was denied on April 23, 2008.  Thereafter, Western Watersheds dismissed its appeal.

**East Castle Creek**

The East Castle Creek allotment is located within the Bruneau Field Office, just to the east of the Battle Creek allotment.  *AR 3730.*  It contains 96,578 acres of BLM land extending 34 miles southwest into the Owyhee mountains.  *AR 13916-17.*

Some 20 miles of streams run through the allotment in five major drainages, including Battle, Poison, Rock, Sheep and West Fork of Shoofly Creeks.  *AR 13948, 11774 (EA).*  There are also 41 upland springs, 28 of which are undeveloped.  *AR 11780, 11914 (map of springs).*

The allotment is home to the sage grouse, among other sensitive wildlife, *AR 11882-84,* and it contains over 40,000 acres of key sage-grouse habitat, with the higher elevation pastures (i.e., 28, 28A, 29 A, B, C and D, and 31) providing nesting habitat, and Pastures 12, 29A, B, C, D, 2, and 28A providing critical late brood-rearing habitat.  *AR 11814.*  Pastures within the central portion of the allotment (i.e., pastures 11B, 44, 26, 27, and 28, among others) contain winter habitat for the sage-grouse.  *AR 11821.*

About 10 miles to the southeast of the allotment lies the Grasmere block, which is a block of about 250,000 acres where the densest concentration of leks in the Bruneau Field Office are located.  *AR 11815.*  The population of sage-grouse in the Grasmere block has declined from 1,000 in 2004-05 to only 400 in 2008.  *AR 11815.*

The BLM has divided the East Castle Creek allotment into 29 pastures, and authorizes three separate permitees to graze livestock in winter, springs, and summer

**Memorandum Decision & Order - 26**

seasons. *AR 13917, 14125 (map of allotment)*.  Under the terms of the most recent

grazing authorization, the total active preference on the allotment is 10,872 AUMs, with

active use totaling 9,601 AUMs. *AR 13918-19, Tables 2B & 3B*.  Between 1998 and

2006, actual use averaged 8,531 AUMs, with a high of 10,201 AUMs in 2005 and a low

of 7,309 AUMs in 2003.  *AR 14023.*

   In 1997, the BLM issued an Allotment Analysis, Interpretation and Evaluation

(1997 Assessment) on the East Castle Creek allotment, which found that livestock

grazing was causing a decline in conditions and trends in native vegetation, watersheds,

streams, watersheds, upland riparian areas, and wildlife habitat.  *AR 16387-613*.  To

address these resource concerns, BLM proposed to reduce livestock grazing by over 25%

on the allotment.  *AR 16081-222 (EA); 15704-783 (final grazing decisions); AR 11700*.

These reductions were never implemented.  *AR 11700.*

   On May 21, 2008, BLM issued its Determination under the Fundamentals of

Rangeland Health, which confirmed the poor conditions found in an assessment

conducted earlier.  *AR 13823-84*.  With regard to Standard 1 (watersheds), the

Determination found that some pastures were meeting the Standard (pastures 11B, 12, &

44); some were not, but were making significant progress toward doing so (pastures 28,

28A & 29A); some were not, but grazing was not a significant factor (pasture 5B); and

some were not, and grazing was a significant factor (pastures 8B, 8B1, 8BIII, 10B).  *AR

13834*.  Similarly, various pastures met Standard 2 (riparian) but pastures 8B, 12, 17, 19,

28, 28A, 29A & 44 failed to meet the Standard and grazing was a significant factor.  *AR

*13843.*  Grazing was also a significant factor in the failure of seven pastures to meet

Standard 4 (native plants), three pastures to meet Standard 7 (water quality), and seven

pastures to meet Standard 8 (endangered species).

 With regard to Standard 8, the BLM concluded that "74% of 47 springs and wet

meadows in the allotment are in marginal or unsuitable conditions for sage grouse brood-

rearing habitat and other wildlife habitat, and [the] trend is downward.  Cause of the

downward trend is heavy use by livestock, erosion and hoof-shearing of wet soils." *AR*

*13873.*  The pastures that failed to meet Standard 8 were pastures 10B, 11B, 12, 28, 28A,

29A, & 44.  *Id.*

 On December 22, 2008, the BLM issued an EA proposing to re-authorize livestock

grazing on the East Castle Creek allotment. *AR 11693-914.*  The EA reviewed the FRH

violations discussed above and concluded that changes to grazing were necessary because

each pasture examined was failing to meet the FRH Standards, significant progress was

not occurring, and current livestock grazing was a significant factor contributing to

current conditions.  *AR 11696.*

 The EA identified a series of alternatives, with Alternative D being BLM's

proposed action alternative.  *AR 11705-743.*  Alternative D set an AUM limit of 9,295.

*AR 11733.*  That is a reduction from the past AUM limit of 10,872.  *AR 13918-19.*  But

the average actual grazing levels – that is, the grazing levels that caused the FRH

violations described above – were 8,531 AUMs.[6]  Thus, Alternative D authorized a level

of AUMs *above* the level that had led to the widespread FRH violations in the East Creek

allotment.

Alternative D removes existing Terms and Conditions requiring a minimum

stubble height on herbaceous vegetation along Birch Creek in pastures 10B and 11B.

Instead, Alternative D adopts Annual Indicator Criteria, which have been discussed

above.  Alternative D also includes the development and construction of 23 range

projects, including the construction of a series of exclosures (i.e., building fences around

upland springs) within and immediately adjacent to important sage-grouse late

brood-rearing habitat.  *AR 11737-41.*

The BLM never examines the impacts of Alternative D on the late brood-rearing

habitat within pasture 10B, most of which is in unsuitable or marginal condition.  *AR

11756, 14001.*  The BLM also never examines the impacts of Alternative D on the late

brood-rearing habitat in pastures 11B, 12, 15, 17, 44, 19, 28, 28A, 29A, and 29D.  *AR

11830-31, AR 14001-03.*  Instead, the BLM claims only that under Alternative D,

"nesting cover for sage grouse would remain in suitable condition" in the summer

pastures.  *AR 11831.*  But, BLM never looks at the impacts of Alternative D on nesting

habitat in the spring and early springs pastures – i.e., when cows are actually in

---

[6]  This average actual use figure was computed by adding together the actual use figures
in the BLM's Appendix C to the FRH Assessment of 2008, for each year 1998 through 2006 and
then dividing by the number of years (9).  *AR 14023.*

**Memorandum Decision & Order - 29**

sage-grouse nesting habitat during the nesting season. Id.

BLM tiered its cumulative impacts analysis back to a 1982 agency analysis, suggesting that this nearly 30-year-old document accurately reflects the current conditions on the public lands within the East Castle Creek allotment. *AR 11857-58.* BLM also limited its analysis to the East Castle Creek allotment and the areas immediately adjacent to the allotment, despite BLM's previously acknowledgment that the Great Basin population of the sage-grouse are a landscape-wide species and migrate across political boundaries, which are known to travel or migrate long distances. *AR 9430-32 (Conservation Assessment).*

On December 24, 2008, the BLM proposed to adopt Alternative D and issued a Finding of No Significant Impact (FONSI) finding that the new grazing scheme will have no significant impact of the public lands and wildlife habitat in and around the East Castle Creek allotment. *AR 11915-17.* Western Watersheds protested the proposed decisions in January 2009. On February 20, 2009, BLM issued its final grazing decisions on the East Castle Creek allotment.

## ANALYSIS

### East Castle Creek & Rockville allotments – Exhaustion of Administrative Remedies

The BLM argues that WWP failed to exhaust its administrative remedies with regard to the East Castle Creek decisions and as to some issues with regard to the Rockville allotment. The BLM points out that WWP never sought an administrative stay of the East Castle Creek grazing decisions and never pursued an administrative appeal of

those decisions.  With regard to the Rockville decisions, WWP did file an appeal, but the BLM argues that it failed to include some claims in that appeal that it now brings in this lawsuit.

The APA requires that agency action be "final" before review may be sought in federal court.  5 U.S.C §704.  An agency action is not considered final for purposes of §704 where the agency provides by rule for administrative appeal to a superior agency authority and provides that the action is inoperative while administrative appeal is pending.  *Id*.  Section 704 thus expresses the administrative "exhaustion" requirement, which applies to all challenges to agency action brought under the APA.  *Darby v. Cisneros*, 509 U.S. 137, 154 (1993).  *Darby* held that administrative exhaustion is required as a prerequisite to judicial review only "when expressly required by statute or when an agency rule requires appeal before review and the administrative action is made inoperative pending that review."  *Id*.

Since *Darby*, the Ninth Circuit has held that exhaustion is not required to challenge BLM grazing decisions.  *See Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 820-21 (9th Cir.2002), abrogated on other grounds by *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7 (2008), as recognized in *Monsanto Co. v. Geertson Seed Farms*, 130 S.Ct. 2743 (2010).  The BLM counters that *Hahn* is no longer good law because the BLM has since changed its regulations: "The current regulations could not be clearer that WWP was required to, at a minimum, administratively appeal BLM's decisions and seek a stay."  *See BLM Reply Brief (Dkt. No. 167)* at p. 28.

**Memorandum Decision & Order - 31**

While the BLM regulations have been changed since *Hahn*, that decision interpreted the old regulations precisely as rewritten.  In *Hahn,* the Circuit held that "[u]nder these regulations, the aggrieved party must file not only an appeal but must also file a petition for a stay of the decision pending appeal as well." *Id*. at 825.  So even though the regulations have been changed as the BLM noted, *Hahn* interpreted the old regulations to read as they are written today; *Hahn* cannot be cast aside as irrelevant.

In rejecting the BLM's exhaustion argument, *Hahn* relied on a BLM regulation that allowed grazing to continue even if a stay had been granted. *Id*. at 826.  *Hahn* found that "the BLM's 'stay' does not render the permit decision inoperative but actually implements an unreviewed decision to renew grazing authorizations and at the same time allows grazing practices that are known to harm the environment." *Id*. at 827.  *Hahn* held that "[b]ecause . . . the BLM's regulations render the decision 'inoperative' in name only, while in fact implementing an unreviewed decision, we hold that exhaustion is not required." *Id*. at 827-28.

The same regulations exist today.  *See* 43 C.F.R. § 4160.4(b) (stating that even if a grazing decision is stayed, the BLM "will continue to authorize grazing . . .").  Thus, *Hahn* compels the Court to reject the BLM's argument that WWP failed to exhaust its administrative remedies because it failed to administratively appeal the decisions challenged here.

In a slightly different version of its exhaustion argument, the BLM argues that WWP filed this action before the East Castle Creek decision was filed.  The BLM points

out that WWP did not add the East Castle Creek claims to its complaint until January 23, 2009, about a month before the final EA was issued on February 20, 2009.

The more important date for finality purposes is the date the BLM issued its FONSI.  *See Rattlesnake Coalition v U.S. E.P.A.,* 509 F.3d 1095, 1104 (9th Cir. 2007) (stating that issuance of FONSI was final agency action for purposes of judicial review). In this case, the BLM issued the FONSI about a month before WWP filed its complaint. Thus, WWP's NEPA claim was not filed prematurely.

The BLM argues, however, that WWP's challenges to the East Castle Creek grazing decision under FLPMA and the Fundamentals of Rangeland Health remain premature because WWP filed its complaint on these claims (the First Amended Complaint) on January 23, 2009, about a month before the East Castle Grazing Decision was issued on February 20, 2009.

WWP counters that it later filed a Second Amended Complaint, about six months *after* the East Castle Creek Grazing Decision was issued, and that if the earlier versions of its complaints were premature, this one was not.  The BLM responds that the Second Amended Complaint was filed pursuant to a stipulation that WWP "will file a Second Amended Complaint specifically identifying all permits and allotments challenged under the Third Claim for Relief, and making no other changes to the First Amended Complaint."  *See Stipulation (Dkt. No. 30).*  The BLM argues that if this Second Amended Complaint is allowed to cure the flaw in the prior premature allegations regarding the East Castle Grazing Decisions, it would violate the Stipulation by making

**Memorandum Decision & Order - 33**

an unauthorized change to the First Amended Complaint.

The Court does not interpret the Stipulation to bar WWP from seeking Court approval for further amendments; the Stipulation simply sets forth the limited amendment to which the BLM agrees.  Given the liberal amendment policy of Rule 15 at that early stage of the proceedings, the amendment is proper.  The First Amended Complaint had specifically challenged the BLM's proposed East Castle Grazing Decisions, and just a month after that complaint was filed, the BLM resolved WWP's protest and issued the final Grazing Decisions.  The clear allegations of the First Amended Complaint put the BLM on notice that WWP was challenging the East Castle Grazing Decisions under FLPMA and the Fundamentals of Rangeland Health.  It is merely a formality to authorize an amendment of the complaint to make the same claim a month later.

**Silver City/Diamond Basin Laches Issue**

The BLM argues that WWP's challenge to the Silver City-Diamond Basin decisions is barred by laches.  To demonstrate laches, the BLM must establish (1) lack of diligence by WWP, and (2) prejudice to itself.  *Apache Survival Coal. v. United States*, 21 F.3d 895, 905 (9th Cir. 1994).  The BLM argues that WWP lacks diligence because it waited 8 years to challenge the Silver City-Diamond Basin decisions.  The BLM further asserts that it is prejudiced because many of the fencing and range projects approved by those decisions have been built and could be removed only at great expense.

The Court disagrees.  First, WWP did not lack diligence.  While the grazing decisions were issued in 2004, WWP appealed those decisions, and the appeals were not

resolved until September 13, 2006.  This lawsuit was filed just over two years from that date.

As there is no question that this lawsuit was filed within the statute of limitations, there arises a "strong presumption" that laches is unavailable.  *Jarrow Formulas Inc. v. Nutrition Now, Inc.,* 304 F.3d 829, 836-37 (9th Cir. 2002).  Morover, "laches is disfavored in environmental cases because the public at-large, and not just the plaintiffs, will be harmed by environmental damage."  *Klamath Siskiyou Wildlands Center v. Boody*, 468 F.3d 549, 555 (9th Cir. 2006).  The BLM's concerns about removing projects already built is a concern over remedies rather than liability, and does not warrant ignoring *Jarrow* and *Boody*.  For these reasons, the Court will reject the BLM's laches defense.

## Primary Jurisdiction

Intervenor Simplot argues that the Court should defer to the agency and apply the doctrine of primary jurisdiction.  The BLM has not joined in this argument.

The Ninth Circuit considers four factors when determining whether to invoke the doctrine of primary jurisdiction: "(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in administration."  *Cal-Almond v. Dep't of Agric.*, 67 F.3d 874, 882 (9th Cir.1995).

The doctrine does not apply here.  WWP pursued its administrative remedies regarding the Battle Creek allotment Final Decision by appealing it and moving for a

**Memorandum Decision & Order - 35**

stay.  When the stay was denied, WWP dismissed its appeal.  There is no pending appeal,
and no indication that the agency would have jurisdiction to hear another challenge by
WWP.  For those reasons, the Court denies Simplot's request to apply the doctrine of
primary jurisdiction.

## NEPA – Cumulative Impacts

WWP claims that each of the five EAs is deficient for failing to adequately analyze
cumulative impacts.  An EA must "fully address cumulative environmental effects or
cumulative impacts."  *Te-Moak Tribe of Western Shoshone of Nev. v. U.S. Dep't of the
Interior,* 608 F.3d 592, 602 (9th Cir.2010).  A cumulative impact is "the impact on the
environment which results from the incremental impact of the action when added to other
past, present, and reasonably foreseeable future actions . . . [and] can result from
individually minor but collectively significant actions taking place over a period of time."
40 C.F.R. § 1508.7.  An EA must include "a sufficiently detailed catalogue of past,
present, and future projects, and provide adequate analysis about how these projects, and
differences between the projects" might impact the environment. *Te-Moak Tribe*, 608
F.3d at 603.

These requirements are not satisfied by general statements about possible effects
or risks; the agency must take a "hard look" at cumulative impacts or explain why it
cannot.  *Id*.  "[S]ome quantified or detailed information is required. Without such
information, neither the courts nor the public . . . can be assured that the [agency]
provided the hard look that it is required to provide."  *Id.*

**Memorandum Decision & Order - 36**

An agency ordinarily has the discretion to determine the physical scope of its cumulative impacts analysis, but its choice must be reasoned and not arbitrary. *Kleppe v. Sierra Club*, 427 U.S. 390, 413-14 (1976); *Idaho Sporting Congress v. Rittenhouse*, 305 F.3d 957, 973-74 (9th Cir. 2002). The agency must articulate a rational explanation justifying its chosen cumulative impact analysis area. *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 895-97 (9th Cir. 2002).

For example, the Forest Service, in reviewing a logging project, properly ignored logging on adjoining lands by explaining that (1) a ridge line separating the lands meant that the two projects would be conducted in separate watersheds and not connected in any manner, and (2) expanding the scope of the NEPA review would artificially dilute the effects of the project. *See Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 959 (9th Cir. 2003). But in another case, the Forest Service failed to explain in its EA why it ignored adjoining road projects in evaluating the impacts of a road project, and that failure led the Circuit to hold that the EA violated NEPA. *Native Ecosystems Council v. Dombeck*, 304 F.3d 886 (9th Cir. 2002).

In the Rockville EA, the BLM defined the scope of analysis to include the Juniper Springs, Sands Basin, and Poison Creek allotments. *AR 23794.* The BLM does not explain why it defined the scope this way, other than to say in the EA the following:

> Livestock grazing decisions in surrounding allotments were issued recently or will be issued within the next five years. If allotments are not meeting Idaho Standards for Rangeland Health and livestock are a significant factor, then grazing management modifications would be made so that significant progress towards meeting the standards occurs. As in this decision, any necessary

adjustments would be in conformance with the land use plan.

*AR 23794.* The BLM's discussion of cumulative impacts in the FONSI is similarly truncated:

> The analysis did not identify any known significant cumulative or secondary effects. Outside this project area, Standards and Guidelines assessments, determinations and subsequent decisions have been made, resulting in changes in livestock management actions, stocking levels and seasons of use. However, those actions in combination with this decision are not expected to result in cumulatively significant impacts.

*AR 23827.*

In the cumulative impacts section of the Silver City/Diamond Basin EA, the BLM notes that

> [a]djacent allotments where grazing decisions will be issued this year include the Flint Creek, Louse Creek, Jump Creek, Rabbit Creek, East Reynolds, Red Mountain, and Boone Peak allotments. Adjacent allotments where grazing decisions will be issued within the next few years include the Fossil Butte and Sinker Butte allotments.

*AR 26724.* There is, however, no specific discussion of the cumulative impacts from grazing on those allotments – the EA simply notes that those allotments are being assessed and that "[a]s changes are implemented in these grazing allotments there would be a cumulative beneficial effect." *AR 26726.*

In the cumulative impacts section of the East Castle Creek EA, the BLM defined the area used to assess cumulative impacts to include "all public State and private land within the East Castle Creek, West Castle Creek, Battlecreek, and Northwest allotments . . . ." *AR 11857.* In addition, the BLM found that the Bruneau-Kuna Grazing EIS from

1982 "contained a comprehensive and still relevant cumulative impact analysis of livestock grazing." *AR 11857*. After a short discussion, the BLM concluded that "the cumulative impacts of the proposed grazing permit renewal are essentially the same as identified in the Grazing EIS (1982) and the analysis of cumulative impacts in still relevant and appropriate." *AR 11858*. With regard to wildlife – and the sage grouse – the BLM defined the scope of the cumulative impact analysis as the Bruneau Field Office. *AR 11860*. The BLM noted its efforts in surrounding allotments to protect wet meadows and riparian areas for late summer and breeding habitat for the sage grouse. But the BLM concluded that it is not possible to predict whether "improving a piece of habitat would have any measurable effect on sage grouse populations." *Id*. The BLM speculated that "[o]ther factors are likely driving the current trend in sage grouse populations." *Id*. The BLM then discussed the destruction of sage habitat by wildfires, including the Murphy Complex Fire. *Id*. Overall, the BLM noted that the Bruneau Field Office "has intact sagebrush ecosystems dominated by native shrubs, grasses and forbs. The impacts from the changes to grazing management in the East Castle Creek allotment would not cumulatively degrade that general habitat condition but would instead improve it." *AR 11862*.

The scope of the cumulative impacts analysis in the Battle Creek EA appears to be Owyhee County, which would include both the Owyhee and Bruneau Field Offices. *AR 3672*. With regard to sage grouse, the cumulative impacts analysis is as follows:

For sage grouse currently in-process permit renewals in adjacent allotments

(East Castle Creek and Big Springs) also focus on wet meadows and riparian areas for late-summer habitat and the condition of sage grouse breeding habitat. Other actions to improve sage grouse habitat are being implemented by the Owyhee County Sage Grouse Working Group mainly focusing on wet meadows on private lands. The hope is that the cumulative effect of all management of sagebrush habitats would be to increase sage grouse populations however there is no way to know now whether that will be true.

*AR 3672.*

This Court has previously been faced with a challenge to the BLM's NEPA analysis renewing grazing permits in sage grouse habitat. In *WWP v Bennett,* 392 F.Supp.2d 1217 (D.Id. 2005), the Court reviewed the BLM's cumulative impact analysis of grazing permit renewals in the Jarbidge Resource Area (JRA), which adjoins the Bruneau Field Office, and held that it was insufficient under NEPA:

> A much more detailed cumulative impact analysis was required because (1) the 28 allotments being evaluated comprised almost half of the JRA; (2) the population of a sensitive species, the sage grouse, was in steep decline in the JRA; (3) the BLM's own analysis identified grazing as a factor in the decline of the sage grouse; (4) FRH violations exist on all 28 allotments at issue; (5) the proposed action-the renewal of the grazing permits-would authorize an increase in overall grazing; and (6) the EAs were, like a horse with blinders, hampered by a restricted field of vision.

*Id.* at 1223. The Court held that the NEPA analysis failed to answer a critical question: "What is the cumulative environmental impact of increasing grazing on 21 of 28 allotments in the face of widespread FRH violations and a dramatic decline of a sensitive species?" *Id.*

Judge Lodge reached a similar conclusion in *WWP v Rosenkrance*, 2011 WL 39651 (D.Id. 2011). The court reviewed a BLM EA that authorized grazing on an

**Memorandum Decision & Order - 40**

allotment that was home to a BLM sensitive species, the bull trout.  The EA failed to

consider the cumulative impacts of grazing permits issued on adjoining allotments.  Judge

Lodge held that the EA "offers no real analysis about cumulative impacts." *Id*. at *13.

He concluded that the "EA simply does not show the big picture." *Id*

     *Bennett* and *Rosenkrance* apply here.  Once again, the BLM's cumulative impacts

analysis is not sufficiently detailed given the poor conditions for the sage grouse on these

allotments.  Each of the five allotments at issue here failed to meet Standard 8, the

endangered species standard, in large part because the sage grouse habitat was

substantially degraded.  The cause – in three of the allotments and a portion of a fourth –

was livestock grazing.  In addition, all five of the allotments had violations of the other

Standards caused by livestock grazing.  These conditions are not unique to the five

allotments and exist in many areas throughout the Owyhee, Bruneau and Jarbidge Field

Offices.

     Yet none of the five EAs at issue here contained a cumulative impact analysis that

discussed the existing conditions of sage grouse habitat and populations throughout the

Owyhee and Bruneau Field Offices.  A wider scope of analysis was particularly necessary

because there were ongoing assessments of grazing impacts in 37 allotments in the

Owyhee Field Office and 14 allotments in the Bruneau Field Office.  Instead of sweeping

those assessments in their cumulative impacts analysis, the five EAs at issue here simply

assumed that grazing restrictions would be imposed on those allotments that would

protect sage grouse.  But even assuming that was true, the point of the cumulative impact

**Memorandum Decision & Order - 41**

analysis is to get beyond the individual allotment analysis and determine the impacts of the overall grazing levels on sage grouse numbers and habitat.

Given the importance of the Great Basin sage grouse population, and the widespread destruction of its habitat and reduction in populations, it was particularly important for the EA to discuss the scope of their cumulative impact analysis. The Rockville, Silver City/Diamond Basin, and East Castle Creek EA conducted their cumulative impacts analysis in an area confined to only a few allotments without explaining why the scope should be so confined when the habitat destruction and population declines are so widespread. The Battle Creek EA talks about expanding its scope of analysis but contains no detailed discussion of the sage grouse populations or habitat in that wider geographic area.

*Bennett* and *Rosenkrance* both hold that NEPA requires more in a cumulative impacts analysis. For the reasons stated above, the Court finds that the five EAs violate NEPA by failing to contain a sufficient cumulative impacts analysis.

## Fundamentals of Rangeland Health

The Fundamentals of Rangeland Health (FRH) regulations set up a framework for evaluating and improving the ecological condition of rangeland used for grazing. Pursuant to the FRH, BLM state directors develop regional standards for rangeland health that apply to grazing permits issued in that region. In 1997, the BLM approved the Idaho Standards and Guidelines.

The Standards set forth criteria to evaluate the environmental health in six areas:

(1) watersheds; (2) riparian areas and wetlands, (3) stream channel/floodplain; (4) native plant communities; (5) seedings; (6) exotic plant communities other than seedings; (7) water quality; and (8) threatened and endangered plants and animals (and sensitive species).  For example, the water quality standard is satisfied if the surface and ground water on the allotment comply with the Idaho Water Quality Standards.  As another example, the sensitive species standard is satisfied if the allotment contains habitat suitable to maintain a viable population of sensitive species.

If an assessment reveals that the Standards are not satisfied, and the BLM makes a final decision to take action to cure the violations, the BLM must "implement the *appropriate action* as soon as practicable, but not later than the start of the next grazing year."  *See* 43 C.F.R. § 4180.2(c)(2) (emphasis added).  The "appropriate action" is defined as action "that will result in significant progress toward fulfillment of the Standards and significant progress toward conformance with the Guidelines."  *Id*. at § 4180.2(c)(3).  While the BLM's regulations did not define "significant progress," the Idaho Standards and Guidelines define it as "[m]easurable and/or observable . . .  changes in the indicators that demonstrate improved rangeland health."  *WWP v U.S. Dept. Of Interior*, 2009 WL 5218020 (D.Id. 2009) at *7.  The FRH regulations require that permits include mandatory Terms and Conditions "that ensure compliance with subpart 4180 [the subpart that sets forth the BLM's duty to take action that would result in significant progress by the next grazing season]."  *See* 43 C.F.R. § 4130.3-1.

Under these regulations, to make "significant progress," the BLM must see

**Memorandum Decision & Order - 43**

"measurable and/or observable changes" demonstrating improvement.  The "measurable

changes" relied upon by the BLM to meet this regulatory requirement are measurements

taken of such things as stubble height, stream bank alteration, riparian browsing, and

utilization of certain plants and grasses.  By taking these measures, the BLM can

determine if its management of the allotment – through AUM limits, seasons-of-use,

fencing and pasture rotation – is making "significant progress" in improving conditions.

However, the BLM's management practices, as embodied in the EA and final

grazing decisions, do not reflect the time-sensitive and compulsory nature of the

regulations. Under its "adaptive management program," the BLM sets certain goals for

these measurements and then monitors them over time.  If the goals are not being met

"over time," the BLM will adapt management by adjusting grazing restrictions.  *AR 3362*

("Failure to achieve [Annual Indicator Criteria] over time that result[s] in not making

significant progress toward meeting [the Standards] will result in adverse administrative

action taken by the Authorized Officer . . . .").

The phrase "over time" is explained by the BLM in the East Castle Creek EA as

follows:

> [O]ne incident of non-compliance [with Annual Indicator Criteria] will not
> necessarily reduce upland vegetation health or impede progress toward
> meeting objectives. In addition, other factors related to plant health, such as
> frequency of defoliation and opportunity for plant growth or regrowth, will be
> factors to consider in deciding whether upland plant health is affected.
> Consideration of other factors that affect upland plant health and likewise,
> riparian health, is important in the implementation of adaptive management in
> East Castle Creek Allotment. Failure to achieve AIC over time that result[s]
> in not making significant progress toward meeting [the Standards] will result

in change in livestock grazing to ensure that progress is made toward meeting
[the Standards].

*AR 11323*.  These measurable factors are thus more than voluntary goals, because a

continuing violation "over time" could result in some consequence.  But they are not

"mandatory" in the sense that a failure to comply will lead to an immediate consequence.

The BLM might decide instead to wait and watch to see if the non-compliance stretches

"over time" before taking action.  The amorphous definition of "over time" gives BLM

officials a nearly unreviewable discretion to wave off failures to comply for an

unspecified number of years.

Despite widespread violations of Standards caused by grazing that directly affect

sage grouse, a sensitive species, the BLM has loosened the restrictions on permit holders.

At the very moment when mandatory Terms and Conditions are called for, the BLM

moves in the opposite direction.

The duty to make "significant progress" must mean something.  Under the plain

language of the regulation, it requires "measurable and/or observable changes in the

indicators" like stubble height, stream bank stability, and plant utilization.  At the same

time, the BLM has a duty to use mandatory Terms and Conditions to "ensure compliance"

with the duty to make significant progress.  *See* 43 C.F.R. § 4130.3-1; *WWP v U.S. Dept.*

*of Interior,* 2009 WL 5218020 (D.Id. 2009).

The BLM points out that it continues to include in the mandatory Terms and

Conditions such requirements as seasons-of-use and field rotation plans.  But these are

**Memorandum Decision & Order - 45**

strategies or tactics that hopefully lead to "measurable" change, and are not themselves the "measurable" change.  In contrast, criteria like stubble height and plant utilization are the "measurable" change itself – they are the criteria the BLM is monitoring, on a regular basis, to determine whether it is making "significant progress."  The BLM's adaptive management program is completely dependent on its regular monitoring of these measurable criteria.  *See WWP v. Forest Service*, 2011 WL 4442668 (D.Id. 2011) (adaptive management program deficient unless agency actually conducts vigorous monitoring program).

The BLM argues that there is no testimony here – as there was in *WWP v U.S. Dept. of Interior, supra* – that the Annual Indicator criteria are indispensable.  Perhaps not, but the lack of testimony does not make these measurable criteria any less important, and that conclusion follows directly from the importance the BLM itself places upon them.  As stated, the BLM's own adaptive monitoring program relies on the regular monitoring of these Annual Indicators, and they are the key "measurable and/or observable" criteria the BLM is monitoring to "ensure compliance" with the FRH Standards.

Moreover, the BLM has itself stated that these Annual Indicators are important to the FRH requirement of making significant progress.  For example, in the Rockville EA, the BLM concluded that the "rest rotation grazing schedule, AUM reduction, and adherence to Annual Grazing Use Indicators, would result in making significant progress towards meeting" the FRH Standards.  *AR 23781.*  With regard to the Silver

City/Diamond Basin allotments, the BLM stated in its Final Decision that "[a]dherence to these [management] guidelines and the prescribed grazing management program would likely maintain or make progress toward meeting the [FRH] Standards . . . ." *AR 26869.* And this analysis applies equally to the East Castle Creek and Battle Creek decisions, which are similarly predicated on compliance with the guidelines as one of the "key strategies" to ensure compliance. *AR 11288, 3359-60.*

Under these circumstances, the Annual Indicators must be within the mandatory Terms and Conditions of a permit. Because the Annual Indicators – and the Management Guidelines in the case of the Silver City/Diamond Basin allotment – are not within the mandatory Terms and Conditions of the final grazing decisions in these allotments, each final decision violates the FRH regulations.

The Court recognizes that the BLM interprets the FRH regulations differently. The Court must give "substantial deference" to the agency's interpretation. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994). An agency's interpretation of its own regulation is "controlling unless plainly erroneous or inconsistent with the regulations." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 171 (2007) (internal quotation marks and citation omitted). However, in this case, the BLM's interpretation allows the measurable criteria it uses to evaluate whether it is making significant progress to be treated more leniently than a mandatory Term and Condition. As discussed above, this is plainly inconsistent with the FRH regulations. Hence, the Court will not give deference to the agency's interpretation.

**Memorandum Decision & Order - 47**

**FLPMA**

FLPMA directs the BLM to develop and maintain comprehensive Resource

Management Plans (RMPs) that govern all aspects of public land management, including

grazing administration.  *See* 43 U.S.C. § 1712 (2000).  Grazing permits must be consistent

with RMPs.  *See* 43 U.S.C. § 1732(a); 43 C.F.R. §§ 1601.0-5(b), 4100.0-8.  RMPs

constrain grazing permits by determining where grazing will be allowed and by setting

environmental standards that all grazing permits must meet.  *See* § 1732(a) (requiring

management "in accordance with the [RMPs]"); § 1752(c)(1) (conditioning renewal of

grazing permits on lands remaining available for grazing in accordance with RMPs).

**Owyhee Resource Management Plan**

The Rockville and Silver City/Diamond Basin decisions must be consistent with

the Owyhee RMP under FLPMA.  At the time the Owyhee RMP and FEIS were issued,

less than 1% of the public lands within its boundaries were in excellent condition, and

only 11% were in good condition.  *AR 29863-870.*  The remaining 88% were either in

poor condition (42%), fair condition (43%), or had recently been treated due to fire or

other disturbance (3%).  *Id.*

Consequently, the Owyhee RMP emphasized  "improvement in ecological

conditions and protection of most of the sensitive resources."  *AR 28712.*  Its "objective"

for grazing was to "[p]rovide for a sustained level of livestock use compatible with

meeting other resource objectives."  *AR 30767.*  Those "other resource objectives"

included protecting sensitive species like sage grouse.  For such species, the "objective"

of the Owyhee RMP was to "[m]anage special status species and habitats to increase or maintain populations at levels where their existence is no longer threatened and there is no need for listing under the [ESA]." *AR 30764.* Specifically with regard to sage grouse, the Owyhee RMP intended to "[i]dentify, protect, and enhance key sage grouse habitats and populations." *AR 30765.*

In these provisions, the Owyhee RMP sets forth its priorities. Grazing is permitted but only to the extent it is "compatible" with the protection of sensitive species like the sage grouse. To the extent livestock and sage grouse conflict, it is grazing that must yield.

When the Rockville decision is compared to these priorities, substantial inconsistencies emerge. For example, as discussed in detail above, grazing has resulted in FRH violations affecting the sage grouse, yet the BLM (1) authorized grazing levels that allow for the same actual use levels that led to the Standard 8 (endangered species) violations, (2) allowed grazing during the same times of the year that the BLM found had contributed to the violations of Standard 1 (watershed) and Standard 8 (endangered species); and (3) moved the criteria for measuring grazing impacts from mandatory Terms and Conditions to the less strict category of Annual Grazing Indicators.

The condition of the Rockville allotment, discussed in detail above, shows that there is a conflict between sage grouse and livestock. The sage grouse habitat is degraded, as shown by the failure of the allotment to meet Standard 8 (endangered species). Under the priorities set by the Owyhee RMP, livestock grazing must yield to

the sage grouse.  Yet by loosening the restrictions on permit holders, maintaining usage levels, and allowing grazing during critical seasons, the BLM has not followed the priorities set in the Owyhee RMP.  For that reason, the Rockville Final Decision violates FLPMA.

The Silver City/Diamond Basin Final Decision has the same flaws.  Again, the sage grouse habitat in this allotment is in bad condition, demonstrated by the failure of eight pastures to meet Standard 8 (endangered species) due to degraded sage grouse habitat.  Once again, the BLM's response was to loosen restrictions on permit holders, maintain historic grazing levels that led to the degraded conditions, and allow grazing during critical nesting and mating seasons every other year.  Once again, the BLM has failed to follow the priorities set by the Owyhee RMP and hence the final decision on the Silver City/Diamond Basin allotments violates FLPMA.

**Bruneau Management Framework Plan**

The Bruneau Management Framework Plan (MFP) was issued by the BLM in 1982, and remains the current FLPMA plan governing the Bruneau Field Office.  The MFP was designed to improve existing conditions in 1982 that found only a "trace" of lands in "excellent" condition, and 73% of the lands in "fair" or "poor" condition.  The EIS accompanying the MFP concluded that "most" of sage grouse habitat was in "unsatisfactory condition."  *AR 28571.*

The MFP states that the BLM will "manage sensitive species habitats in the [Bruneau Field Office] to maintain or increase existing and potential populations."  *AR*

*86.* It also states that the BLM will "[m]anage springs, seeps and meadows and adjacent upland areas as key wildlife habitats for upland game." *AR 114.* To accomplish that, the BLM will "[c]ontrol livestock grazing on these habitats by the implementation of grazing systems, season of use and other management practices such as salting away from water sources." *Id.*

The MFP also stated that the BLM would "manage 520,000 acres of sage grouse range . . . to improve nesting, brood rearing, and winter habitats." *AR 115.* The MFP recognized that "[r]iparian and meadow vegetation are important [sage grouse] brooding areas if suitable adjacent protective cover is present. Without such cover, total habitat and thus the potential population is adversely affected." *AR 117.* To protect that necessary cover, the MFP states that the BLM will "adjust livestock season of use on spring and summer ranges to meet minimum growth needs of preferred plant or forage species." *AR 58.*

In summary, the Bruneau MFP gives priority to sensitive species like the sage grouse and requires the BLM to manage livestock grazing in "springs, seeps and meadows and adjacent upland areas" and to adjust livestock season of use to meet minimum growth needs of preferred plants and forage species that provide sage grouse habitat.

WWP alleges that the BLM's grazing authorization on the Battle Creek allotment violates the agency's duty to manage livestock in the critical wet areas of that allotment. Much of the wet areas are in good condition: The BLM's Determination

**Memorandum Decision & Order - 51**

found, as discussed above, that 90% of the allotment's watershed met Standard 1, and 17 miles of streams were in proper functioning condition.

WWP focuses, however, on the allotment's 18 springs that contain critical sage grouse brood-rearing habitat. *AR 4459*. Ten of the 18 springs "have been developed to provide water for livestock." *Id*. More than half of the springs have been assessed by the BLM as "non-functioning" or "functioning-at-risk." *AR 4460*. Their condition contributed to the BLM's Determination that the allotment was not meeting Standard 8 (endangered species) due to cattle grazing. For example, Hutch Springs had been "heavily grazed" and yet had "enough water late in the summer to retain green vegetation and could provide summer habitat for sage grouse." *AR 4235*. But instead of developing sage grouse habitat here, and moving cattle away, the BLM decided to keep grazing the area and fence off the springs. This type of management – refusing to reduce AUMs or change seasons-of-use but instead building fences and other range projects – appears to be the standard BLM practice for protecting the springs on the Battle Creek allotment.

These decisions violate the Bruneau MFP's direction to manage livestock grazing in "springs, seeps and meadows and adjacent upland areas" for two reasons. First, while fencing might protect the springs from livestock, it also ensures that this potential critical habitat cannot be used by sage grouse. Given the rapidly diminishing habitat for these birds, that is a serious deficiency. Second, fencing hurts sage grouse: The 2004 Conservation Assessment concludes that fencing provides a perch for sage grouse predators and a collision hazard that can result in death. *AR 24371*. The BLM did not

**Memorandum Decision & Order - 52**

discuss these well-established drawbacks of fences and the loss of sage grouse habitat in what might otherwise be a critical habitat area.  For these reasons, the BLM's management of the springs on the Battle Creek allotment is not consistent with the direction in the Bruneau MFP to manage livestock grazing in "springs, seeps and meadows and adjacent upland areas."

With regard to the East Castle Creek allotment, pastures 8B, 8BI, and 8BIIIF were found to violate Standard 4 (native plants) due to livestock grazing.  The BLM's Determination found that a contributing cause to this violation was that utilization was very high and that "[u]se dates overlap the critical growth stages for Sandberg's bluegrass and therefore do not provide adequate deferment." *AR 13858*.  Yet the BLM decided to continue to graze each of these pastures from April 1st through the 30th and from May 137 through the 30th in alternating years, *AR 11733 (EA),* dates that continue to overlap the critical growth period for Sandberg's bluegrass. *AR 13858*.  In addition, the BLM continued to allow utilization of Sandberg bluegrass, and other key upland grass species, at the high rate of 40%. *AR 11733*.  The same holds true for pastures 10B and 12, both of which were found to violate Standard 4 due to livestock grazing, and which remain grazed within the critical growth stage of native vegetation. *AR 13859, 11733, 26941.*

This grazing authorization on the East Castle Creek allotment, in the face of a failure to meet Standard 4, is inconsistent with the Bruneau MFP's direction to "adjust livestock season of use on spring and summer ranges to meet minimum growth needs of preferred plant or forage species." *AR 58*.  The BLM's grazing scheme on the Battle

Creek allotment similarly contravenes the requirements of the Bruneau MFP to protect native plant communities.  Prior to 1999, BLM authorized grazing in pastures 8 and 21 from April 1 to May 31; in pasture 9 and 22 from May 6 to July 10, and in pasture 12 from May 20 to July 20.  *AR 3534 (EA)*.  In its 1999 assessment, BLM concluded that this grazing system was not meeting the minimum growth needs for native plant communities.  *AR 5690*.  Yet the BLM's new final grazing decisions on the Battle Creek allotment adopt these same seasons-of-use.  *AR 3534*.  These decisions are not consistent with the Bruneau MFP and hence violate FLPMA.  The BLM has failed to comply with the direction of the Bruneau MFP to provide rest or deferment of the native grass communities across Battle Creek pastures 8, 9, 12, 21 and 22, and East Castle Creek pastures 8B, 8BI, 8BIII, 10B, and 12.

## Conclusion

The Court therefore finds that the BLM's grazing decisions on all five allotments violate NEPA, FLPMA, and the FRH regulations.  Accordingly, the Court will grant WWP's motion for partial summary judgment and deny those motions filed by the defense.[7]

### ORDER

In accordance with the Memorandum Decision set forth above,

---

[7]  In one of its briefs, the BLM seeks to strike two Declarations filed by WWP.  The Court will deny the request.  The Court finds that the Declarations are necessary to explain complex matters and are hence reviewable.  *See Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005).  In addition, they contain material available to the BLM and there is no dispute over their accuracy.  *See WWP v. U.S. Forest Service*, 2006 WL 292010 (D.Id. 2006).

NOW THEREFORE IT IS HEREBY ORDERED, that WWP's motion for partial summary judgment (docket no. 133) is GRANTED.

IT IS FURTHER ORDERED, that the BLM's motion for summary judgment (docket no. 153); Simplot's motion for partial summary judgment (docket no. 156); and the intervenors' motion for summary judgment (docket no. 149) are DENIED.



DATED:  **February 6, 2012**

Honorable B. Lynn Winmill
Chief U. S. District Judge