IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, | |
| Plaintiff, | Case No. 4:08-CV-435-BLW |
| v. | **MEMORANDUM DECISION AND ORDER** |
| S.M.R. JEWELL, Secretary, Dept. Of Interior, et al., | |
| Defendants. | |
| J.R. SIMPLOT CO., et al., | |
| Intervenor-Defendants, | |
| PUBLIC LANDS COUNCIL, NATIONAL CATTLEMEN'S BEEF ASSOCIATION, IDAHO CATTLE ASSOCIATION, | |
| Intervenor-Defendants. | |

## INTRODUCTION

The Court has before it cross-motions for summary judgment. The Court heard

oral argument, and took the motions under advisement. For the reasons expressed below,

the Court will grant WWP's motion and deny those of the defendants and intervenors.

## SUMMARY

In this lawsuit, WWP has challenged some 600 BLM decisions that allegedly

failed to protect sage grouse, a species that is in such decline that the BLM designed it as

a "sensitive" species, to be treated as if it was a candidate species under the Endangered

Species Act.  To make the litigation manageable, the parties agreed to file a series of summary judgment motions concerning specific allotments that were representative of many others.

In the first round of litigation, the Court found insufficient the environmental reviews governing grazing permits on five allotments.  In this second round, the Court finds that reviews of four other allotments were similarly insufficient.

## STANDARD OF REVIEW

The Court's review of these four permit renewals by the BLM is governed by the Administrative Procedures Act (APA), 5 U.S.C. § 706(2)(A).   Under the APA, the reviewing court must set aside the agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  A decision is arbitrary and capricious if the agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  *O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm'n*, 92 F.3d 940, 942 (9th Cir.1996).  An agency action is also arbitrary and capricious if the agency fails to articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.  *Id*.  Finally, an agency must set forth clearly the grounds on which it acted.  *See Atchison T. & S.F. Ry. v. Wichita Bd. of Trade*, 412 U.S. 800, 807 (1973).

"Review under the arbitrary and capricious standard is narrow, and the reviewing court may not substitute its judgment for that of the agency." *O'Keeffe's*, 92 F.3d at 942 (citing *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 376 (1989)). Courts "must be at [their] most deferential when reviewing scientific judgments and technical analyses within the agency's expertise." *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010). Courts "are not to act as a panel of scientists, instructing the agency, choosing among scientific studies, and ordering the agency to explain every possible scientific uncertainty." *Id.* at 1074 (citation omitted). "'When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.'" *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) (quoting *Marsh,* 490 U.S. at 378). With this in mind, the reviewing court must still undertake a "thorough, probing, in-depth review" of the agency's decision. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971).

## LITIGATION BACKGROUND

In its original complaint, WWP challenged about 600 separate decisions of the BLM concerning some 40 million acres spread out over two states, Idaho and Nevada. WWP's basic claim is that each decision fails to protect the sage grouse, a BLM-designated sensitive species.

The BLM filed a motion to dismiss that the Court granted in part, finding that the challenges to the decisions of the BLM's Nevada District Offices should be severed and transferred to the District of Nevada. The Court denied the motion in all other respects.

Thereafter, the parties agreed to, and the Court approved, the use of a "staggered" approach to summary judgment. In the first round of summary judgments, WWP would challenge the BLM's renewal of grazing permits on certain allotments in the Owyhee and Bruneau Field Offices, and then, after receiving a decision on those, would start a second round by challenging another set of decisions. The Court has resolved the permit challenges made in the first round, s*ee WWP v. Salazar,* 843 F.Supp.2d 1105 (D. Idaho 2012), and is now resolving those made in the second round.

In this first round, WWP challenged BLM decisions to renew grazing permits on five allotments: (1) Rockville; (2) Silver City, (3) Diamond Basin; (4) Battle Creek; and (5) East Castle Creek. The latter two allotments are in the Bruneau Field Office; the former three are in the Owyhee Field Office. The Court granted summary judgment to WWP, holding that the five permits renewals (1) violated NEPA because the BLM failed to conduct a sufficient cumulative impacts analysis; (2) violated FLPMA because the grazing allowed by the permits was not consistent with the Range Management Plans governing the relevant Field Office; and (3) violated the Fundamentals of Rangeland Health regulations because the BLM moved certain grazing restrictions out of the mandatory Terms and Conditions category and made them discretionary. *Id.*

In this second round, WWP is making many of the same claims against permit renewals for four allotments within the Burley Field Office: Jim Sage, Cassia Creek, Chokecherry, and Almo-Womack. WWP claims that the permit renewals on these four allotments (1) violated NEPA because the BLM failed to conduct a sufficient cumulative impacts analysis, and failed to consider alternative grazing levels, including a no-grazing

alternative.; (2) violated FLPMA because the grazing allowed by the permits was not consistent with the Cassia Resource Management Plan (Cassia RMP); and (3) violated the Fundamentals of Rangeland Health regulations because the BLM moved certain grazing restrictions out of the mandatory Terms and Conditions category and made them discretionary.

In addition, both sides seek summary judgment concerning nine other allotments that were renewed without any environmental review pursuant to the 2003 grazing rider. Both sides ask the Court to resolve whether the BLM properly applied the rider.

Before resolving those legal claims, the Court will first examine basic facts about the sage grouse and then turn to a review of the condition of each allotment and the BLM's decision to renew grazing on each allotment.

## FACTUAL BACKGROUND

### Sage Grouse Characteristics

The Court described in detail the overall status of the sage grouse in its earlier decision and will not repeat that entire discussion here. In summary, sage grouse inhabit the sage steppe ecosystem found in ten western states, including Idaho. They are sagebrush obligates, and rely on sagebrush all year to provide roosting, cover and food. They typically inhabit large, interconnected expanses of sagebrush habitat, and thus are characterized as a landscape-scale species. While some populations are resident, others have been recorded traveling distances up to 100 miles. Sage grouse in Idaho moved as far as 50 miles from breeding and nesting sites to summer ranges, although migration

may be much shorter depending on the distance between ranges.  On an annual basis migratory sage-grouse populations may occupy an area that exceeds 1,042 square miles.

During the winter months, sage grouse depend almost exclusively on sagebrush for food. As winter turns to spring, in early March, sage grouse move to breeding areas known as leks.  In Idaho, the lek season runs from about March 15 to May 1.  In establishing leks, sage grouse prefer sites with extensive cover of low grasses, surrounded by taller sagebrush.

After mating, the female moves away from the lek to establish a nest.  The nesting season in Idaho lasts from about April 1 to June 15.  This nesting season is critical because the sage grouse has one of the lowest reproductive rates of any North American game bird, and its populations are not able to recover from low numbers as quickly as many other upland game bird species.

Greater sage grouse populations have been declining for at least 25 years.  The 2004 Conservation Assessment, prepared by the leading scientific experts, concluded that every major metric in sage grouse population abundance has declined over the last 50 years.  The declining populations are occurring as sage brush habitat disappears.  The leading experts concluded in the Idaho Conservation Plan that "[t]he loss and fragmentation of sage-grouse habitat in some parts of Idaho are of major concern."  *See Conservation Plan* at p. 3-3.  The top four causes of this habitat loss and fragmentation in Idaho are (1) wildfire, (2) infrastructure, (3) annual grasses, and (4) livestock impacts. *Id*. at p. 4-3.

To protect sage-grouse from further habitat and population losses, the BLM adopted in November of 2004, a National Sage-Grouse Habitat Conservation Strategy to give management direction and guidelines to BLM Field Office staff. The BLM has also designated greater sage-grouse a "sensitive" species across its range, pursuant to BLM's 2001 Special Status Species Policy. That Policy requires that "sensitive" species be afforded, at a minimum, the same protections as candidate species for listing under the ESA, and makes BLM Field Office managers responsible for implementing the Policy.

**<u>Burley Field Office</u>**

The Burley Field Office is located in south-central Idaho, largely in Cassia County. The area is bordered on the north by the Snake River and on the south by Nevada and Utah. To both the east and the west, the Field Office is bordered in part by portions of the Sawtooth National Forest. It covers about 1.6 million acres of land. The Bruneau and Owyhee Field Offices – discussed in the Court's decision on the first round of motions – lie to the west of the Burley Field Office separated by the Jarbridge Field Office.

The Burley Field Office contains large tracts of sage grouse habitat that support part of the Great Basin core population of sage grouse, one of the five largest remaining core populations across the entire range of this species. The management of the Burley Field Office is governed by the Cassia RMP. It was adopted in 1985, and concluded that 70% of the public lands were in fair to poor condition. *SAR 7101.* The trend was also poor – 81% of the land was in a static or downward trend. *SAR 7101-2.* Livestock grazing was damaging riparian areas and food sources for the sage grouse. The Cassia

RMP concluded that the "[e]ffects on sage grouse deserve special attention since this species would be affected the most. Livestock grazing would not allow sage grouse habitat and populations to improve. A rapid removal of forbs by livestock on spring and summer ranges would have an adverse impact on juvenile sage grouse, especially those areas where forbs are scarce." *SAR 7112*.

The lands governed by the Cassia RMP were divided into various Management Areas. All four allotments at issue here are within Management Area 10 (MA 10). Each allotment in MA 10 received an "I" classification, meaning that the allotments were in unsatisfactory condition or had significant resource conflicts with good potential for improvement. *SAR 6927, 6945*.

To improve the condition of the land, the initial draft of the Cassia RMP proposed various alternatives; the final draft selected "Alternative C." While this alternative planned to increase grazing 7%, it also planned to impose mandatory terms and conditions that would eventually result in 90% of the land categorized as being in an increasing trend, and that would apply to each allotment in MA 10. *SAR 7104, 7198*. Those mandatory terms and conditions included the following: (1) "Streams and wetlands will be managed to restore, protect, and enhance the quality and quantity of the aquatic habitat on public lands," *SAR 7025;* (2) "Rangeland management grazing systems will be implemented to protect or improve riparian/wetland areas," *id;* (3) BLM will "[t]ake necessary measures to eliminate conflict or land uses that will jeopardize threatened, endangered, or sensitive species," *SAR 7026*; (4) "Where conflicts between

wildlife and other land uses occur, conflicts will be resolved in favor of wildlife," *id.*; and

(5) "Public lands will be managed to maintain or improve wildlife habitat," *SAR 7033*.

**Jim Sage Allotment**

The Jim Sage allotment contains 66,417 acres. The sage grouse use areas within this allotment during the winter, and for breeding and late brood-rearing habitat. Large areas within the eastern and central portions of this allotment are considered key sage grouse habitat by the Idaho Department of Fish and Game (IDFG). There are 15 livestock permittees authorized to graze within the allotment, and the average actual use totals 3,517 AUMs. *See* SAR 7-8, 771, 779.

In 2003, the BLM issued an evaluation of this allotment under the Fundamentals of Rangeland Health (FRH). The BLM concluded that the allotment was in violation of 6 of the 7 applicable FRH standards, including those for riparian areas, stream channels, native plant communities, seedings, water quality, and wildlife habitat for sensitive species. *SAR 765-770.* The Idaho Department of Environmental Quality ("DEQ") reached the same conclusion: "After visiting several springs, creeks, and canyons in the Jim Sage Allotment we agree with the BLM that grazing practices have played a large rol[e] in their degradation. Stream banks were trampled and bare of vegetation, riparian plants were either absent or heavily grazed and stream channels in many areas were severely entrenched." *SAR 3286.*

**Cassia Creek Allotment**

The Cassia Creek allotment is located just north of the Jim Sage allotment but is much smaller, containing only 3,615 acres. According to the IDFG, nearly two-thirds of

the allotment contains key sage grouse habitat and the remainder has high potential for restoration. The allotment contains one lek. *SAR 727.*

The allotment is grazed between May 1 and June 15, and the actual use permitted is 697 AUMs. The average actual use if about 413 AUMs. *See SOF (Dkt. No. 227-1) at* ¶ 61. In 2003, the BLM's FRH evaluation determined that the applicable standards on this allotment were Standards 1 (watersheds), 5 (seedings) and 8 (Sensitive Species). The BLM found that Standards 1 and 8 were being met, but that excessive livestock grazing was causing violations of Standard 5. *SAR 720-24.*

**Chokecherry Allotment**

The Chokecherry allotment is the smallest of the four at issue, containing only 1.057 acres. Sage grouse do occupy the allotment. *SAR 750.* Two permittees are allowed a total of 307 AUMs by 90 head of cows annually. *SAR 1932-33.*

In 2003, the BLM's FRH determination showed that four of the six applicable standards were not being met: Riparian Areas and Wetlands Case (Standard 2), Stream Channel/Floodplains (Standard 3), Water Quality (Standard 7), and Threatened and Endangered Species (Standard 8). *SAR 744-48.* Current livestock grazing caused three of these violations, with heavy utilization, bare ground, bank trampling, and lack of native vegetation as significant factors. *Id.*

**Almo Womack Allotment**

The Almo Womack allotment is just west of the Jim Sage allotment. It contains 4,194 acres. While there are no leks found on the allotment, sage grouse have been spotted there. *SAR 709-710.* Large areas within this allotment are considered key sage

grouse habitat by the IDFG.  *See Cole Declaration* at Exh. 4.  In 2002, the BLM

conducted a FRH determination on this allotment.  The BLM found that the allotment

was violating Standard 8, relating to Sensitive Species, but also found that current

livestock grazing was not a cause.  *SAR 705.*

**2006 Environmental Assessment**

In 2008, the BLM issued its final Environmental Assessment (EA) on the four

allotments at issue here.  The BLM also issued Findings of No Significant Impact

(FONSI) and final grazing decisions for the four allotments.  *SAR 1-86* (EA), *SAR 89-648*

(final grazing decisions and FONSI).  WWP claims in this lawsuit that the EA, and

associated decisions, violate NEPA.

The EA examined three alternatives – the proposed action and alternatives 1 and 2.

Ultimately the EA selected alternative 2.  The BLM did not consider any alternative that

reduced grazing levels.  In fact, each of the alternatives was nearly identical to one

another and to the current levels and seasons of use.  *Id.* at 7-17 (describing Proposed

Action, Alt. 1 and Alt. 2).

For example, under Alternative 2, "permitted AUMs . . . would remain the same as

described in the proposed action [alternative]." *Id*. at 14.  Permitted AUMs in the

proposed action alternative "reflect what is currently allocated and will not change." *Id.*

at 8, Table 3.  And, under Alternative 1, "[p]ermits would be issued at the current AUM

level."  *Id.* at 13.  Thus, all three alternatives proposed identical AUM levels.

Moreover, the grazing season-of-use was essentially the same for each alternative.

For example, the proposed action alternative proposed an identical season-of-use as under

the prior grazing scheme for 17 of 20 permittees allowed to graze these allotments, and only minor adjustments for the remaining three permittees. *SAR 7* at Table 3. Under Alternative 1, BLM proposed to continue "current season of use for each allotment as described in the proposed action (see Table 3)." *Id.* at 13. And, Alternative 2 similarly proposes that "management in these areas would continue as described in the proposed action alternative." *Id.* at 15.

The BLM did not consider a "no grazing alternative" because, according to BLM, its implementation would not meet the underlying purpose and need for the action to renew/modify grazing permits authorizing livestock grazing. *SAR 18.*

## ANALYSIS

### NEPA – Cumulative Impacts Analysis

WWP claims that the EA is deficient for failing to adequately analyze cumulative impacts. An EA must "fully address cumulative environmental effects or cumulative impacts." *Te-Moak Tribe of Western Shoshone of Nev. v. U.S. Dep't of the Interior,* 608 F.3d 592, 602 (9th Cir.2010). A cumulative impact is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . . [and] can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7. An EA must include "a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects" might impact the environment. *Te-Moak Tribe,* 608 F.3d at 603.

These requirements are not satisfied by general statements about possible effects or risks; the agency must take a "hard look" at cumulative impacts or explain why it cannot. *Id.* "[S]ome quantified or detailed information is required. Without such information, neither the courts nor the public . . . can be assured that the [agency] provided the hard look that it is required to provide." Id.

An agency ordinarily has the discretion to determine the physical scope of its cumulative impacts analysis, but its choice must be reasoned and not arbitrary. *Kleppe v. Sierra Club,* 427 U.S. 390, 413-14 (1976); *Idaho Sporting Congress v. Rittenhouse,* 305 F.3d 957, 973-74 (9th Cir. 2002). The agency must articulate a rational explanation justifying its chosen cumulative impact analysis area. *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 895-97 (9th Cir. 2002).

In *WWP v Rosenkrance*, 2011 WL39651 (D.Id. 2011), Judge Lodge reviewed a BLM EA that authorized grazing on an allotment that was home to a BLM sensitive species, the bull trout. The EA failed to consider the cumulative impacts of grazing permits issued on adjoining allotments. Judge Lodge held that the EA "offers no real analysis about cumulative impacts." *Id*. at *13. He concluded that the "EA simply does not show the big picture." *Id.*

In assessing the EAs in round one, the Court found *Rosenkrance* applicable to the cumulative impact analysis in those EAs. *WWP v Salazar, supra,* at 1127. The Court found that for those EAs, the cumulative impacts analysis was similar to that evaluated in *Rosenkrance* – they failed to discuss the existing conditions of sage grouse habitat and populations in the surrounding areas. This failure was particularly troubling because

each of the five allotments at issue failed to meet Standard 8, the endangered species standard, in large part because the sage grouse habitat was substantially degraded. The cause – in three of the allotments and a portion of a fourth – was livestock grazing.

The cumulative impacts analysis in the EA at issue in round two suffers from the same flaws. Once again the sage grouse habitat is degraded – three of the four allotments violated the FRH Standard 8, the Sensitive Species Standard. The cumulative impacts section contains no real discussion of the conditions of sage-grouse in these surrounding allotments.

This failure is all the more acute because, as will be discussed further below, the BLM is avoiding environmental reviews for many permit renewals. For permits renewed under the 2003 grazing rider, the BLM has taken the position that it need not do any NEPA or FLPMA review. The BLM has now renewed over 150 permits under the rider without any environmental review. The effect of unexamined permit renewals in the area would be critical to determining cumulative impacts.

The Court recognizes that it must scour the entire EA to determine if the cumulative impact analysis could be enhanced by reading the EA in its entirety and not just focusing on the section labeled "Cumulative Impacts." *See Ctr. for Envtl. Law & Policy v. U.S. BOR,* 655 F.3d 1000 (9th Cir. 2011). But the necessary cumulative impacts discussion cannot be found anywhere in the EA.

For all of these reasons the Court finds that the EA evaluating the four allotments at issue here violated NEPA by failing to contain an adequate cumulative impacts analysis.

## NEPA – Failure to Consider Alternatives Including No-Action Alternative

As discussed above, the EA evaluated three alternatives, each of which proposed essentially the same AUMs and season of use.  Moreover, a no-grazing alternative was not evaluated.  This Court held in its decision on the first round of motions that the failure to consider alternatives to the existing grazing levels, and the failure to evaluate a no-grazing alternative, violates NEPA.  *WWP v. Salazar, supra*.  "[T]he alternatives analysis is naturally the heart of the environmental [review]."  *Oregon Natural Desert Ass'n v. BLM*, 625 F.3d 1092, 1099 (9th Cir.2010).  The EA must "rigorously explore and objectively evaluate all reasonable alternatives," and the "existence of a viable but unexamined alternative renders an environmental impact statement inadequate."  *Id*.

In this case, the EA failed to identify reasonable alternatives.  The existing grazing levels were contributing to sage grouse habitat degradation and yet the EA evaluated no alternative that would have reduced grazing levels and/or increased restrictions on grazing.  The Ninth Circuit has recently struck down a NEPA analysis where each alternative permitted grazing at the same level.  *WWP v. Abbey,* 719 F.3d 1035 (9th Cir. 2013).  For the same reason, the EA in this case violated NEPA.

## Fundamentals of Rangeland Health

In 1997, the BLM adopted the Idaho Standards and Guidelines under the FRH regulations.  The Standards set forth criteria to evaluate the environmental health in six areas: (1) watersheds; (2) riparian areas and wetlands, (3) stream channel/floodplain; (4) native plant communities; (5) seedings; (6) exotic plant communities other than seedings; (7) water quality; and (8) threatened and endangered plants and animals (and sensitive

species). For example, the water quality standard is satisfied if the surface and ground water on the allotment comply with the Idaho Water Quality Standards. As another example, the sensitive species standard is satisfied if the allotment contains habitat suitable to maintain a viable population of sensitive species.

If an assessment reveals that the Standards are not satisfied, and the BLM makes a final decision to take action to cure the violations, the BLM must "implement the appropriate action as soon as practicable, but not later than the start of the next grazing year." *See* 43 C.F.R. § 4180.2(c)(2). The "appropriate action" is defined as action "that will result in significant progress toward fulfillment of the Standards and significant progress toward conformance with the Guidelines." *Id.* at § 4180.2(c)(3). While the BLM's regulations did not define "significant progress," the Idaho Standards and Guidelines define it as "[m]easurable and/or observable ... changes in the indicators that demonstrate improved rangeland health." *WWP v. U.S. Dept. of Interior*, 2009 WL 5218020 (D.Id.2009) at *7. The FRH regulations require that permits include mandatory Terms and Conditions "that ensure compliance with subpart 4180 [the subpart that sets forth the BLM's duty to take action that would result in significant progress by the next grazing season]." *See* 43 C.F.R. § 4130.3–1.

The FRH regulations are time-sensitive and compulsory. In round one, the Court held that specific restrictions based on such things as stubble height, steam bank alteration, riparian browsing, and utilization of certain plants and grasses had to be contained as mandatory terms and conditions within every permit under the FRH

regulations.  *WWP v. Salazar, supra* at 1128-30.[1]  In that case, the BLM had made those

criteria discretionary rather than mandatory, and the Court held that this violated the FRH

regulations.  *Id.* at 1130.

The grazing permits for the four allotments at issue here contain the same

provisions.  The criteria that must be mandatory are instead voluntary and discretionary.

Thus, the Court finds that the final grazing decisions at issue for the four allotments

violate the FRH regulations for the same reasons found in *WWP v Salazar, supra.*

## FLPMA

WWP argues that the BLM's management of grazing in the four allotments is not

consistent with the Cassia RMP and thus violates FLPMA.  To resolve this issue, the

Court must examine the details of the grazing permits and evaluate whether they abide

with the Cassia RMP, given the conditions on each allotment.  This analysis may change,

however, once the BLM has modified the permits as required by the Court's decision

above.  Additional terms and conditions will become mandatory and a new cumulative

impacts analysis may result in modifications of each permit.  Because the circumstances

could change so substantially, the Court would basically be rendered an advisory opinion

by ruling on the FLPMA issue at this time.  For that reason, the Court declines to address

the FLPMA issue, but will allow the issue to be raised again if the modified permits fail

to abide by the Cassia RMP.

---

[1] The Court gives these criteria merely as examples of the type of measurable criteria compelled by the FRH regulations.  The Court defers to the BLM as to the measurable criteria it ultimately decides to place in the grazing permits.

## Cessation of Grazing

In round one, the Court remanded the environmental reviews to the BLM but refused to halt the grazing. The Court found that the "BLM can remedy the flaws identified in the Court's opinion without a total cessation of grazing." *WWP v. Salazar,* 2012 WL 4470952 at *3 (D.Id. 2012). The same result is warranted here. The Court will merely remand the matter to the BLM and will not halt grazing in the interim as the BLM makes the changes dictated by this decision.

## Grazing Rider

The parties identify 9 permits that were renewed under the terms of the 2003 grazing rider contained in § 325 of Public Law 108-108. All of these permits govern grazing on allotments outside the Jim Sage allotments. The BLM's Burley Field Office has used the grazing rider to renew grazing permits without doing any NEPA or FLPMA review in 168 of 200 allotments since 2005.

The BLM argues that § 325 tolls the BLM's deadline to comply with all applicable laws, including NEPA and FLPMA to allow the BLM to catch up on a massive backlog of environmental reviews. In previous cases before this Court, the BLM has argued that § 325 completely absolved the BLM from following NEPA and FLPMA in renewing permits. *See WWP v. Bennett,* 2008 WL 2003114 (D. Id. 2008). The Court rejected the argument, holding that § 325 expressly required that renewals be consistent with FLPMA. *Id.*

In this case, the BLM presents a new argument, that § 325 merely tolls the time for NEPA and FLPMA review, allowing that review to come after the permit is renewed. This new argument warrants a new look at § 325, which reads as follows:

> SEC. 325. A grazing permit or lease issued by the Secretary of the Interior . . . that expires, is transferred, or waived during fiscal years 2004-2008 shall be renewed under section 402 of the Federal Land Policy and Management Act of 1976, as amended (43 U.S.C. 1752) . . . The terms and conditions contained in the expired, transferred, or waived permit or lease shall continue in effect under the renewed permit or lease until such time as the Secretary of the Interior . . . completes processing of such permit or lease in compliance with all applicable laws and regulations, at which time such permit or lease may be canceled, suspended or modified, in whole or in part, to meet the requirements of such applicable laws and regulations. Nothing in this section shall be deemed to alter the statutory authority of the Secretary of the Interior or the Secretary of Agriculture . . . . Provided further, That notwithstanding section 504 of the Rescissions Act (109 Stat. 212), the Secretaries in their sole discretion determine the priority and timing for completing required environmental analysis of grazing allotments based on the environmental significance of the allotments and funding available to the Secretaries for this purpose. . . .

In its prior decision, this Court focused on the phrase that expiring permits "shall be renewed under section 402 of the Federal Land Policy and Management Act of 1976, as amended (43 U.S.C. 1752) . . . ." That statute, the Court noted, stated that permit issuance be "consistent with the governing law." *See* 43 U.S.C. § 1752(a). Thus, the language in § 325 – when read together with the quoted statutory language – means that the renewals must be consistent with FLPMA. *Bennett, supra,* at *7.

The BLM, changing its argument from waiver to tolling, now focuses the Court's attention on that part of § 325 stating that "[t]he terms and conditions contained in the expired, transferred, or waived permit or lease shall continue in effect under the renewed permit or lease until such time as the Secretary of the Interior . . . completes processing of

such permit or lease in compliance with all applicable laws and regulations . . . ."  Other courts have interpreted that language to have a tolling effect on the BLM's duty under NEPA:  "In essence, Section 325 changes the relevant environmental analysis that applies to grazing permits from a condition precedent into a potential condition subsequent; the analysis still has to occur, but for the time being, not prior to renewal of the permits." *WWP v. BLM,* 629 F.Supp.2d 951, 970 (D. Ariz. 2009); *see also Great Old Broads for Wilderness v. Kempthorne,* 452 F.Supp.2d 71, 81 (D.D.C. 2006)(holding that § 325 "require[s] reissuance of expired . . . grazing permits prior to the completion of otherwise required actions").

While holding that NEPA claims, among others, were tolled, neither case discussed the language cited by this Court concerning FLPMA.  While the Court finds persuasive the holdings of these two cases for obligations other than FLPMA – such as NEPA – the Court cannot find that their reasoning extends to FLPMA.  The rider expressly carves out an exception for FLPMA, as this Court held in *Bennett,* and the two cases cited above never address the FLPMA language in § 325.  While this analysis might appear at first glance to create a conflict between *Bennett* and the two cases, they are actually easily reconciled:  While § 325 tolls the BLM's obligation to proceed with environmental obligations imposed by laws like NEPA, it carves out an exception for FLPMA and requires a continuing obligation to follow that statute.  This reading recognizes the rule of statutory interpretation that effect must be given, if possible, to every word, clause and sentence of a statute.  *U.S. v. Wenner,* 351 U.S. 969, 975 (9th Cir. 2003).

This is the interpretation urged by WWP, and so the Court will grant its motion for summary judgment on this issue. The Court will deny the motions filed by defendants and intervenors on this issue.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for summary judgment filed by plaintiff (docket no. 227) is GRANTED.

IT IS FURTHER ORDERED, that the motions for summary judgment filed by defendants and intervenors (docket nos. 241, 246 & 248) are DENIED.

IT IS FURTHER ORDERED, that the EA, FONSI, and Final Grazing Decisions concerning the Jim Sage allotment, Cassia Creek allotment, Chokecherry allotment, and Almo Womack allotment are hereby REMANDED to the BLM for further action consistent with this decision.

DATED: September 29, 2014

B. Lynn Winmill
Chief Judge
United States District Court